HARRIS ET AL., RESPONDENTS, *v.* LLOYD ET AL., AP-
PELLANTS.

[Argued November 14, 1891.   Decided December 28; 1891.]

APPEAL—*Findings.*—Where the parties to an equitable action submitted special findings to the jury and conceded the right of the court as chancellor to treat them as advisory merely, they cannot be heard on appeal to question the power of the court to exercise the right to adopt or disregard them according to his conscience.

SAME—*Same.*—Findings of fact not within the issues cannot support a judgment. (*Dutro* v. *Kennedy*, 9 Mont. 101, cited.)

MINES AND MINING— *Mining partners— Obligations inter se.* —In the absence of a special contract, there is no relation of trust between tenants in common of mining property, who are partners only for the purpose of developing the same, which prevents one from receiving a higher sum for his interest than is paid to his co-owners.

SAME— *Same—Same.* — Where the partnership relations of co-owners of mining property do not extend to selling the property, but only to developing and mining it, and their operations in that connection had ceased, their relationship is that of tenants in common, and being such, one is under no legal obligation to disclose to the others the fact that upon a sale of the property he is to receive a higher sum for his interest than the others, and the concealment of such fact does not entitle his co-owners to maintain an action for any portion of the additional sum which he received.

*Appeal from Second Judicial District, Silver Bow County.*

Action to enforce a vendor's lien.   The cause was tried before McHATTON, J.   Plaintiffs had judgment below.

*Robinson & Stapleton,* and *Forbis & Forbis,* for Appellants.

The plaintiffs, although satisfied with the bargain, after learning that Lloyd was to receive more than they had asked or received, insist that they are entitled to their proportionate share of whatever Lloyd was to receive from the sale over and above the amount specified in the deed and agreement.   While fraud and concealment are alleged in the complaint, the proof shows no unfairness in the transaction, other than that Lloyd exacted more for his share than the others were to receive, and that he did not so inform them.   If these facts sustain the findings of the court, or considering these facts as findings, if they support the decree, then there is nothing in the first specification.   We contend, however, that there was: 1st, no actual or constructive fraud practiced by Lloyd; and 2d, that there was no such relation of trust existing between the plaintiffs and the defendant Lloyd as tenants in common as required Lloyd to divulge the price that he was to receive.   Upon the first point it cannot be claimed that Lloyd has in any wise mislead the plaintiffs, for the evidence contains nothing that can be so construed.   The plaintiffs contend, however, that one tenant in common sustains such relations to his co-owner that he may not deal with or concerning the common property without doing so in the most open manner.   Or, in other words, the trust relation between tenants in common is like that existing between partners.

Under the present state of the authorities, the court will find but little enlightenment upon this subject, and the question is one that the court must deal with in the light of but one precedent that has come to our notice. (*Matthews* v. *Bliss*, 22 Pick. 48.) Bigelow on Fraud, 273, cites and approves this decision. We believe, however, upon principle, that the court must conclude that there is no trust relations between tenants in common. It is a relation that is not founded upon contract. Any person however disreputable may become the tenant in common of another, and that without his consent. Often tenants in common are altogether unknown one to the other, and just as often one has no confidence in the integrity of the other; one has no authority in law to bind another in matters concerning the common property, or otherwise; neither can one encumber or convey the interests of the other. The law only requires that one shall not injure the other by either buying an outstanding title or by segregating the common property, and this is not upon the principle of trust so much as because the law permits no one to do another wrong.

*John T. Baldwin,* and *Cole & Whitehill,* for Respondents.

It is contended by appellants that there was no such relation of trust existing between the respondents and Lloyd as tenants in common as required him to divulge the price that he was to receive. The evidence shows that Lloyd and the respondents were not only tenants in common, but partners in respect to the properties which were sold. Even if Lloyd were only a tenant in common and not a partner he had no right to sell the whole property without divulging to his cotenants the price he was to receive. The counsel in their brief appear to have "but little enlightenment upon this subject," and in their darkness have found but one authority, which in reading the court will find throws very little light on the counsel's proposition. Notwithstanding the paucity of authority of counsel for appellants, we insist that the court without difficulty will find ample authority in the decisions and text-books to maintain that a fiduciary relation does exist between tenants in common, and in support of that principle would cite the following: "When two

or more persons have a joint claim to property the community of their interests creates a mutual obligation that neither shall do anything to the prejudice of the other." (Tyler on Ejectment and Adverse Enjoyment, p. 925; *Van Horne* v. *Fonda,* 5 Johns. Ch. 388; *Stark* v. *Barrett,* 15 Cal. 368, 369; *Flagg* v. *Mann,* 2 Sum. 520; *Lee* v. *Fox,* 6 Dana, 176; *Rothwell* v. *Dewees,* 2 Black, 613; *Roberts* v. *Thorn,* 25 Tex. 728; 78 Am. Dec. 552; *Venable* v. *Beauchamp,* 3 Dana, 321; 28 Am. Dec. 74; *Bracken* v. *Cooper,* 80 Ill. 229; *Mandeville* v. *Solomon,* 33 Cal. 42, 43; 4 Kent [12th ed.], p. 371, n. *c*; 1 Washburn on Real Property, p. 589; 2 Pomeroy's Equity Jurisprudence, p. 624, and n. 1, and §§ 1044–1053, inclusive; *Mitchell* v. *Reed,* 16 N. Y. 139; 19 Am. Rep. 252.) Courts of equity have carefully refrained from defining particular instances of fiduciary relations. (2 Pomeroy's Equity Jurisprudence, §§ 907, 956, and note, and see particularly § 963.) The relations of tenants in common are those of mutual trust and confidence. (Freeman on Cotenancy and Partition, §§ 151, 154, 157, 158.) The acts of one cotenant are presumed to be for the benefit of all. (Freeman on Cotenancy and Partition, § 166.) The authorization of one cotenant to act for all may be inferred from the acts of the parties, and there need be no express delegation of authority from one cotenant to act for another. (Freeman on Cotenancy and Partition, § 188.) The respondents and Lloyd were at least mining partners, and under the law, as laid down in California and Montana, a fiduciary relation exists between such partners. (*Kahn* v. *Smelting Co.* 102 U. S. 641; *Duryea* v. *Burt,* 28 Cal. 569; *Jennings* v. *Ricard,* 15 Morr. Min. Rep. 624; *Kieth* v. *Kellam,* 35 Fed. Rep. 243; *Nolan* v. *Lovelock,* 1 Mont. 224; *Dougherty* v. *Creary,* 30 Cal. 290; *Skillman* v. *Lachman,* 23 Cal. 199; 83 Am. Dec. 96.) It is a general principle of law that partners are trustees for each other in respect to the partnership business and property, and are liable to each other on principles which bind trustees; neither partner can clandestinely stipulate for a private advantage for himself. Every advantage which he can obtain in the business of the firm must inure to the benefit of each and every member of the firm. (Lindley on Partnership, 495; Story on Partnership, §§ 174, 175; Parsons on Partnership, §§ 224, 226; Colyer on

Partnership, §§ 181, 182; *Comstock* v. *Buchanan*, 57 Barb. 140; *Mitchell* v. *Reed*, 61 N. Y. 126; 19 Am. Rep. 252.) Clandestine *bonus* to a partner or prospective partner is not permitted, but such *bonus* is required to be divided with all the other members of the firm or copartnership either formed or in course of forming, or afterwards fully formed and completed. (*Fassett* v. *Whitehouse*, 11 Morr. Min. Rep. 250; 2 Pomeroy's Equity Jurisprudence, §§ 956, 963; *Short* v. *Stevenson*, 63 Pa. St. 95; *Hedger and Horn's Appeal*, 63 Pa. St. 273.) The evidence in this case clearly shows that a fraud was practiced by Lloyd upon the respondents by both misrepresentations and concealments, by his secretly contracting to take thirty thousand dollars from Couch to the exclusion of his co-owners, when the thirty thousand dollars was in fact a part of the consideration for the property sold, and procuring them to sign and execute a contract of sale and deeds of the property without informing them of the true consideration of the sale, and by having said papers read to them, which papers falsely stated the consideration to be one hundred thousand dollars, when in truth and in fact the actual consideration was one hundred and thirty thousand dollars. (2 Pomeroy's Equity Jurisprudence, §§ 908, 909.) Fraudulent concealments and misrepresentations may be made by acts as well as words. (2 Pomeroy's Equity Jurisprudence, §§ 900, 902; 1 Story's Equity Jurisprudence, § 384, et seq.)

BLAKE, C. J. — This action was brought to recover a judgment for the sum of fifteen thousand dollars on account of the sale of certain lode mining claims to Thomas Couch, and for the sale of property which had been conveyed by Couch to the Boston and Montana Consolidated Copper and Silver Mining Company. No general verdict was requested by the court or any of parties, and the jury returned the following special findings: —

"The jury in the above-entitled action will find a special verdict by answering the following questions: (1) Were the plaintiffs and the defendant, John Lloyd, engaged jointly in working and developing the mines mentioned in the complaint, known as the 'Harris and Lloyd tunnel property,' from the

year 1879 or 1880 to on or about the month of March, 1888? Answer. Yes. (2) If you answer the foregoing question yes, were they working the said mines with a view of extracting ores and selling the property? A. Yes. (3) Did the owners interested in said property, while so jointly interested, do and perform work and labor and expend money of the total value and amount of about twenty thousand dollars? A. Yes. (4) Did they each contribute a proportionate share in the expenses incurred in the working of such mining property? A. Yes. (5) Did they share proportionately in the profits and losses incurred or accruing from said work? A. Yes. (6) Did the defendant Lloyd and the defendant Couch enter into an agreement by which the defendant Lloyd was to receive thirty thousand dollars, in addition to the one hundred thousand dollars mentioned in the contract, lease, and deed? A. Yes. (7) Did the defendants Lloyd and Couch, or either of them, conceal from the plaintiffs the fact of the making of such agreement for the payment of thirty thousand dollars? A. No. (8) Did the plaintiffs know of such agreement for the payment of thirty thousand dollars to Lloyd until after said property was accepted and sold and the deed delivered? A. Yes. (9) Did the defendants Lloyd and Couch, or either of them, by acts or words, represent to or conceal from the plaintiffs during the negotiation for the sale of said property that the sum of one hundred thousand dollars was the entire consideration or purchase price of same? A. No. (10) Was said sum of thirty thousand dollars, mentioned in the agreement between defendants Lloyd and Couch, a part of the consideration and purchase price of said mining property? A. Yes. (11) Did the defendants Couch and the Boston and Montana Consolidated Copper and Silver Mining Company have notice of the claim of the plaintiffs to one half of said thirty thousand dollars before twenty-two thousand dollars of said thirty thousand dollars was paid to said defendant Lloyd, or any other person? A. Yes."

The following findings were submitted by the court on its own motion: "(1) Did John E. Lloyd, before or at the time that the contract and deed for the property were signed, inform the plaintiffs that he was to receive the additional thirty thousand dollars on the sale? Answer. No. (2) Did John E.

Lloyd, in his negotiations with Couch, offer the entire property to him for the sum of one hundred and thirty thousand dollars or one hundred and fifty thousand dollars, and did Couch accept his proposition of sale and agree to pay one hundred and thirty thousand dollars for the entire property? A. Yes. (3) If you find that John E. Lloyd negotiated and effected a contract of sale of the entire property, then answer if he had any agreement with the plaintiffs to sell their interest for them, and, if so, at what price. A. No. (4) Did the plaintiff and defendant, John E. Lloyd, and the other owners in the mining property mentioned in the complaint at any time before the contract for the sale of the same, enter into an agreement between themselves to sell the same for the benefit of all in proportion to their respective interests? A. No. (5) Did all the owners of the mining property in question have an agreement or understanding and consent between themselves by which all were to consent and agree together with reference to all matters touching their interest in the property before any action was done by any or all of them with reference to said property? A. No."

The two following special findings were requested by defendant, and also submitted to the jury: "(5) Did the defendant, John E. Lloyd, in any manner whatever, induce the plaintiffs to accept at the rate of one hundred thousand dollars for their interest in the property described in the complaint? Answer. No. (6) Did the defendant, John E. Lloyd, at any time or at all, make any false representations to the plaintiffs whereby they were induced to sign the contract with Thomas Couch for the sale of the property described in the complaint? A. No."

The court afterwards made its findings of fact and conclusions of law therein as follows: "This cause having been tried to a jury, which has returned special findings of fact in answer to requests submitted therefor, and having been submitted to the court, on motion of plaintiffs, for judgment and decree on the pleadings, evidence, and findings herein, the court, as chancellor, makes the following findings of fact, and accepts, confirms, and approves the findings of the jury in so far as their findings are embraced and herein included, and rejects and sets aside such of the findings of the jury as are not embraced herein;

and any findings herein made which are not supported by the findings of the jury are made by the court of its own motion." Facts found: —

"1. That the plaintiffs and defendant, John E. Lloyd, were for a period of more than eight years prior to the month of March, 1888, co-owners and tenants in common, in the proportions mentioned in the complaint, of the mining property described in the complaint, and known as the 'Harris and Lloyd tunnel property.'  (2) That during all of said time they were engaged jointly in working and developing said property, with a view of extracting ores, and of selling said property, and the owners did during said time jointly perform work and labor and expend money of the total value and amount of about twenty thousand dollars ($20,000) thereon.  (3) That they each contributed a proportionate share, according to their respective interests, in the working of said mining property during said time, and shared proportionately in the profits and losses incurred or accruing from said work.  (4) That the above relations of the parties to each other regarding said property continued up to and existed at the time the contract of lease and sale mentioned in the complaint was entered into, although they had ceased work on said property some two or more weeks before that time.  (5) That the defendant, John E. Lloyd, did, on or about the nineteenth day of March, 1888, and before the thirty-first day thereof, make a proposal to, and enter into an agreement with the defendant, Thomas Couch, to sell to him all of the said property, and by which agreement the defendant Lloyd was to receive thirty thousand dollars ($30,000) in addition to the one hundred thousand dollars ($100,000) mentioned in the contract, lease, and deed, as he claimed, for signing the deed for his share and that of his brothers; which agreement for the additional thirty thousand dollars ($30,000) was without the knowledge or consent of the plaintiffs, and which agreement he concealed from them.  (6) The defendant Lloyd never informed either of the plaintiffs of the existence of said contract for thirty thousand dollars ($30,000) additional at all; and the defendant Couch never informed either of them until the property was accepted and sold and the deed delivered, and they had no knowledge of the

same until after said time. (7) That the defendant Lloyd represented to the plaintiffs, by signing the deed with them for the sum of one hundred thousand dollars ($100,000), and the contract with Samuel J. Reynolds for two thousand dollars ($2,000), that the sum of one hundred thousand dollars ($100,000) was the entire consideration for the sale of said property. (8) That the defendant Lloyd effected the sale of said property, and the thirty thousand dollars ($30,000) mentioned in the agreement between the defendants Lloyd and Couch was a part of the consideration and purchase price of said mining properties, and that the contract of sale executed to Couch by the owners was not made on behalf of the plaintiffs by Samuel J. Reynolds. (9) That the defendant Lloyd had no agreement with the plaintiffs whereby he was to receive any consideration for making a sale of said property, or receive or retain said thirty thousand dollars ($30,000) for his own use. (10) That the defendant Lloyd induced the plaintiffs to accept at the rate of one hundred thousand dollars ($100,000) for their interests in the property described in the complaint. (11) That the defendant Lloyd, by signing the deed and contract, selling for the entire consideration at one hundred thousand dollars ($100,000), and concealing the fact that he had an agreement for the payment of an additional thirty thousand dollars ($30,000), induced the plaintiffs to sign the contract and deed with Thomas Couch for the sale and conveyance of the property described in the complaint. (12) That the defendants Couch and the Boston and Montana Consolidated Copper and Silver Mining Company knew of the interests and titles of the plaintiffs in and to said property at the time of the contract and purchase of the same, and had notice of the claim of the plaintiffs to one half of said thirty thousand dollars ($30,000) before twenty-two thousand dollars ($22,000) of said thirty thousand dollars ($30,000) was paid to said defendant Lloyd or any other person. (13) That the findings requested by defendants, and not herein specifically found or passed upon, are found against them."

Conclusions of law: "From the findings of fact the court finds the following conclusions of law: (1) That at the time of the contract for the sale of the property described in the

complaint by Lloyd and others to Couch a partnership existed
between the parties owning the property with reference thereto
—that is to say, between the plaintiffs and Lloyd *et al.*—and
they are entitled to share proportionately in the proceeds thereof.
(2) That, being the co-owners and tenants in common thereof,
they were entitled, under the circumstances, to share proportion-
ately in the proceeds of the sale thereof, and such sale was for
the benefit of all the owners.    (3) That the plaintiffs are entitled
to a judgment and decree as prayed for in their complaint or bill
herein."

All the parties upon the trial conceded the right of the judge
to treat the findings of the jury as advisory, and adopt or dis-
regard any of them according to his conscience.   Upon this
hearing, however, the appellants contend that this power cannot
be exercised under the Constitution and laws of this State; but
under these circumstances we decline to enter this field of
research.   We shall assume, for the purpose of this investiga-
tion, that the court below had the jurisdiction to act independ-
ently of this verdict, and make its own findings of fact.   We
are therefore compelled to ignore the action of the jury and
confine our inquiry to the proceedings of the court.   In *Stock-*
*man* v. *Riverside etc. Irrigation Co.* 64 Cal. 57, Mr. Justice
Ross for the court said: "It is insisted on behalf of the ap-
pellants that, as the findings of the court upon some of the
material issues are contrary to the findings of the jury upon the
same issues, this court should, notwithstanding a substantial
conflict of evidence upon those issues, proceed to weigh the evi-
dence, and decide whether it preponderates in favor of the find-
ings of the court or of the jury.   To this we cannot assent.
The findings of fact by the court are as conclusive here as they
would be if no jury had been impaneled in the case.   The
question for us is whether there is sufficient evidence to sustain
the findings of the court upon the material issues. . . . . It
has often been held here that the verdict of a jury in an equity
case is but advisory to the court, and in this case it appears to
have been the understanding between the parties that it was
to be regarded in that light only."   (Hayne on New Trial and
Appeal, § 234; *Freeman* v. *Stephenson*, 63 Cal. 499.)

It is our duty to review the testimony, and determine

whether the findings of the court are supported. After a careful examination of the record, we assert that the findings on which the judgment is founded cannot be upheld; and that, at the time of the sale of the property, there was not a partnership between the owners by which the plaintiffs were entitled to receive their respective shares of the sum of one hundred and thirty thousand dollars.

The mining property which is described in the pleadings was owned and developed by the parties as tenants in common for the period of eight years prior to March 31, 1888. Each of these persons during this time paid his share of the debts which were incurred, and said John E. Lloyd was never the agent of any of the respondents, and had no authority to control or dispose of their interest. About two weeks after they had completed the work thereon, in March, 1888, and settled the expenses thereof, there was no contract for further mining or exploration. The owners then executed an agreement, whereby they covenanted to sell the property in consideration of the sum of one hundred thousand dollars. There is not a word in the testimony which tends to prove that the relations of these parties were of a fiduciary or any higher character than that of tenants in common of the property when this agreement was entered into. The court below finds that said John E. Lloyd, by his fraudulent conduct and misrepresentations, induced the respondents to execute the instruments which have been referred to, and take their respective portions of the consideration of the sum of one hundred thousand dollars. When we weigh the opinion of the court as well as the facts in connection with the evidence, it is apparent that these deductions have been drawn, not from direct and positive testimony, but from the action of said Lloyd when signing, with his co-owners, said instruments, and his silence respecting his contract with Couch, whereby he was to receive the sum of thirty thousand dollars; in other words, the court has stated legal conclusions in the form of the facts arising from its view of the obligations of the parties as mining partners and tenants in common.

A leading case is that of *Matthews* v. *Bliss*, 22 Pick. 48, and Chief Justice Shaw, as the organ of the court, says: "The gist of the action was the conspiracy of the three defendants, after

having agreed upon a sale of the brig at a large price, to induce the plaintiff's agent, by a concealment of the fact that the vessel could be sold for such price, and by false and fraudulent representations, to sell the plaintiff's quarter part of the vessel at a price much below that which they had so agreed to sell for. The court are of opinion that the direction of the judge who tried the cause was correct in stating to the jury that the mere non-disclosure of the fact, within their own knowledge, that they could sell and had agreed to sell the brig for a higher price, would not be sufficient to support the action, and that they were under no legal obligation to disclose that fact, and that withholding was not such a fraudulent concealment of the truth as would of itself maintain the action. The court are of opinion that the tenants in common of a vessel, who are not engaged jointly in the employment of purchasing or building ships for sale, do not stand in such a relation of mutual trust and confidence towards each other in respect of the sale of such vessel that each is bound, in his dealings with the other, to communicate all the information of facts within his knowledge which may affect the price or value. A different rule may prevail in respect to any contract for the use or employment of the common property, in which relation, perhaps, they may be deemed to place confidence mutually in each other; but, as in common cases of tenants in common of a vessel, they are independent of each other in all matters of purchase and sale, and may deal with each other in the same manner as owners of separate property. Each may act upon the knowledge which he has, without communicating it. But *aliud est tacere, aliud celare.*" This doctrine is approved by Mr. Bigelow in his work on Fraud (vol. 1, p. 368).

There are some cases concerning the rights of tenants in common which do not affect the case at bar, although the respondents rely upon them. It is generally held that the purchase of a tax or outstanding title or encumbrance, or claim on the property by one tenant in common, inures to the benefit of all, although the decisions are not uniform in announcing the ground upon which this principle is founded. In *Hurley* v. *Hurley*, 148 Mass. 444, Mr. Justice Holmes cites many authorities to illustrate these distinctions, and says: "It will be

found in most of the cases that the party setting up the tax-title was under an obligation to pay the taxes. . . . . There are strong grounds for saying that there were no special fiduciary relations between the petitioner and the respondent Daniel T. in this case. Their titles were in part derived from different sources."

In *Barnes* v. *Boardman*, 152 Mass. 391, Mr. Justice Devens said in the opinion: "The rule that, when tenants in common are actually in possession, or are entitled to immediate possession, a purchase of an encumbrance on the common property will generally be deemed to have been made for the benefit of all if they shall consent to pay their proportional shares thereof, and that to this extent a certain fiduciary relation exists between the tenants in common, is one that is sustained by many authorities. (*Van Horne* v. *Fonda*, 5 Johns. Ch. 388; *Flagg* v. *Mann*, 2 Sum. 486; 4 Kent Com. [13th ed.] 371, and cases cited; 1 Washburn on Real Property [5th ed.], 430, and cases cited." See, also, the cases cited in the note to *Barnes* v. *Boardman, supra,* in 9 Law Rep. Ann. 571; *Venable* v. *Beauchamp*, 3 Dana, 321; 28 Am. Dec. 83, and notes.) The respondents insist that each of the cotenants in lode mining property must labor for his and their interests in the same degree, and that what he does for himself is for the common good. This position is not sustained by the courts, and the cases we have examined do not modify the doctrine of *Matthews* v. *Bliss, supra,* relating to the rights of tenants in common in the sale of their interests in property. Their fiduciary relations are not created or enlarged if they become mining partners. (*Bissell* v. *Foss,* 114 U. S. 252; *Kimberly* v. *Arms*, 129 U. S. 512.)

In *Bissell* v. *Foss, supra,* it is held that "there is no relation of trust or confidence between mining partners which is violated by the sale and assignment by one partner of his share in the company assets and business to one or more of his associates, without the knowledge of the other associates." The statement of facts is lengthy, and must be omitted. In the opinion Mr. Justice Woods said: " The contention is that these three parties were in such relations to each other that, if one bought a share in the common property and business, it inured in equity to the benefit of all, subject to the payment by each of the associates

of his share of the purchase money.  The relations from which this result springs are stated to be those, *first,* of joint tenants, and *second,* of partners; and that, by reason of these relations, Foss and Hunter became trustees for themselves and Bissell in purchasing the share of the Missourians.  It is true that one of two or more tenants in common, holding by a common title, cannot purchase an outstanding title or encumbrance upon the joint estate for his own benefit.  Such a purchase inures to the benefit of all, because there is an obligation between them, resulting from their joint claim and community of interest, that one of them shall not affect the claim to the prejudice of the others.  (*Rothwell* v. *Dewees,* 2 Black, 613; *Van Horne* v. *Fonda,* 5 Johns. Ch. 388; *Lloyd* v. *Lynch,* 28 Pa. St. 419; 70 Am. Dec. 137; *Downer* v. *Smith,* 38 Vt. 464.)  But this rule cannot apply to Hunter and Foss.  They purchased no outstanding title or encumbrance to the prejudice of the other tenant in common.  They did what any tenant in common with entire goood faith might do, namely, purchased the interest of some of their cotenants without consulting the others.  The title which they purchased of the Missourians was not antagonistic or hostile to the title of Bissell.  Their purchase did not in any degree tend to injure or damage his interest.  His share was just as valuable after as before the purchase, and his rights were the same.  In such a purchase no trust or confidence is violated.  Nor do we think that the relations of the parties as partners prohibited Foss and Hunter from making the purchase in question for their own benefit, to the exclusion of Bissell. The association of Bissell, Foss, Hunter, and the Missourians was not an ordinary partnership.  It is what is known as a ʻmining partnership,' which is a partnership *sub modo* only. ⚬ . . . . It follows from these propositions that one member of a mining partnership has the right, without consulting his associates, to sell his interest in a partnership to a stranger, and that such a sale injures no right or property of the other associates.  Much less does a purchase by one associate of the share of another inflict any wrong upon the other members of the partnership.  There is no relation of trust or confidence between mining partners which is violated by the sale and assignment by one partner to a stranger, or to one of the asso-

ciates of his share in the property and business of the association. It results as a conclusion from these premises that Bissell has suffered no wrong at the hands of either Hunter or Foss on the ground that they were his tenants in common or partners, by reason of any contract made between the latter in reference to the purchase of the share of the Missourians in their joint enterprise. There has been no violation of any trust and confidence arising from the relations existing between Bissell, Foss, and Hunter."

The same views were reiterated in *Kimberly* v. *Arms, supra,* by Mr. Justice Field: " The case of *Bissell* v. *Foss,* 114 U. S. 252, does not seem to us to have any bearing on the subject under consideration. There the question was whether a member of a mining partnership — that is, a partnership formed for the development and working of a mine — could acquire the shares of an associate without the knowledge of the other associates, and hold them on his own account; and the court held that it was lawful for him to do so. Mining partnerships or associations, whilst governed by many rules relating to ordinary partnerships, have some rules peculiar to themselves. One of such rules is that a member may convey his interest or shares to another person without dissolving the partnership, and thus bring into it a new member without the consent of his associates; and may purchase interest in the same, or any other mines, for his own benefit, without being required to account to the partnership for the property. (*Kahn* v. *Smelting Co.* 102 U. S. 641.) The partnership between Arms and Kimberly was not a mining partnership, in the proper sense of that term. It was not a partnership for developing and working mines, but for the purchase and sale of minerals and mining lands, and in that respect was subject to the rules governing ordinary trading or commercial partnerships. It can no more be called a mining partnership than a partnership for the purchase of the products of a farm, and the lands upon which those products are raised, can be called a partnership to farm the lands."

We have quoted extensively from the foregoing cases by reason of the eminence of the jurists who delivered the opinions, and the clearness with which the law has been expounded. Their applicability to the case before us can be seen without

difficulty. They establish the proposition that, in the absence of a special contract, there is no relation of trust or confidence between tenants in common, who had been partners in the development of lode mining claims, which prevents one of them from demanding and receiving a higher sum for his interest in the property than is paid therefor to his co-owners.

The court finds as a fact that the parties during a period of more than eight years were "engaged jointly in working and developing said property with a view of extracting ores and of selling said property;" and also that these relations "existed at the time the contract of lease and sale mentioned in the complaint was entered into." The legal conclusion is that "at the time of the contract for the sale of the property . . . . by Lloyd and others to Couch, a partnership existed between the parties owning the property with reference thereto, . . . . and they are entitled to share proportionately in the proceeds thereof." These findings of fact are not within the issues, and cannot support a judgment.

The court in *Dutro* v. *Kennedy*, 9 Mont. 101, said: "Had the judge found and so decreed otherwise, the findings would have been disregarded as being outside of the issues. (*Marks* v. *Sayward*, 50 Cal. 57; *Gregory* v. *Nelson*, 41 Cal. 279.)" The court in *Marks* v. *Sayward*, 50 Cal. 60, said: "The plaintiff contends that these facts are not within the issues, and we are of the opinion that this position must be sustained. There is nothing in the proceedings pointing to the existence of a partnership." (See, also, *Morenhout* v. *Barron*, 42 Cal. 605; *Devoe* v. *Devoe*, 51 Cal. 543; *Green* v. *Chandler*, 54 Cal. 626.)

The complaint alleges: "The plaintiffs, the defendant, John E. Lloyd, and their other said co-owners and tenants in common in the premises hereinbefore described, obtained and acquired title thereto a number of years ago, to wit, on or about the first day of September, A. D. 1881, with the intention and for the purpose of prospecting, developing, working, and mining the same, and to that end and purpose they then agreed among themselves and with each other to associate themselves together, and they and every of them did then enter into and form an association, company, and mining copartnership, whereby they agreed and undertook to develop, work, and mine the said

premises, and to bear, share, and divide the expenses, issues, profits, and losses of and incident to such venture and undertaking among themselves, in proportion and according to the interest, part, and moiety claimed and owned by each of them, respectively, therein; and that, in pursuance of said agreement, they, about the date last above named, jointly entered upon, and for a long time, to wit, for more than six years, prior to the execution of the contract of sale, lease, and deed hereinafter mentioned, actually engaged in developing and mining upon the said premises, by sinking shafts, driving and running tunnels, levels, and cross-cuts, and stoping therein and thereon, at great outlay and expense to said cotenants and mining copartners, to wit, about the sum of twenty thousand dollars, which expenses so incurred were borne and paid proportionately by each and every of them, as aforesaid, and the proceeds of the minerals and ores extracted therefrom in the prosecution of said work and mining were divided and shared by each of them in the ratio aforesaid." There is no allegation in any of the pleadings that this development work was done for the purpose of selling the property, or that there was any copartnership organized for this object. The averment of the complaint is that the mining copartnership agreed and undertook "the development work and mining of said premises," and paid therefor according to their respective interests. The contract with Couch devolved upon him this responsibility at his own expense. There is a broad distinction between the partnership which is described in the complaint and that which is created by the court. (*Kimberly* v. *Arms, supra.*)

The court also finds that said John E. Lloyd, "by signing the deed and contract, selling for the entire consideration at on hundred thousand dollars ($100,000), and concealing the fact that he had an agreement for the payment of an additional thirty thousand dollars ($30,000), induced the plaintiffs to sign the contract and deed with Thomas Couch for the sale and conveyance of the property described in the complaint." What are the allegations of the complaint concerning this part of the case? That John E. Lloyd and Couch, "and each of said defendants, falsely and fraudulently, with the intent to deceive, cheat, and defraud the plaintiffs, suppressed the truth, and

represented to the plaintiffs that the entire consideration and purchase price to be paid for the sale and conveyance of said premises was only the sum of one hundred thousand dollars, when they, the said defendants, very well knew that the said representation was false and untrue, and that in truth and in fact the real and actual consideration to be paid therefor was at least the sum of one hundred and thirty thousand dollars. That on or about the thirty-first day of March, 1888, the plaintiffs having been deceived and misled by the said false and fraudulent concealments and representations, which they then believed to be true, were inveigled and induced thereby to join the defendant, John E. Lloyd, and their other said cotenants in making and executing a written lease and contract of sale, which the defendant Lloyd first signed, upon certain terms and conditions therein specified, to the said defendant and Couch."

It will be remarked that there is a conflict between these allegations and the findings, and the court does not justify its action by any declarations of Couch, John E. Lloyd, or any of the appellants. According to the complaint, the false representations were made by Couch, John E. Lloyd, and each of the defendants before, and caused the respondents to join in, the execution of the instruments. The court reverses this order of conduct, and deduces from the act of John E. Lloyd in signing the papers, and silence of John E. Lloyd and Couch, the fraudulent statements. We may observe that the jury found for the appellants upon these issues, and we repeat two of the special findings: "Did the defendant, John E. Lloyd, in any manner whatever induce the plaintiffs to accept at the rate of one hundred thousand dollars for their interest in the property described in the complaint? Answer. No. Did the defendant, John E. Lloyd, at any time or at all make any false representations to the plaintiffs whereby they were induced to sign the contract with Thomas Couch for the sale of the property described in the complaint? A. No." The court virtually approved this part of the verdict, and upon another ground has inferred its facts.

When, therefore, we divest the findings by the court of all the matters which are outside of the issues, the relations of the

owners of said property, when the instruments were executed, were those of tenants in common and no more. Prior to that time they had been mining partners within definite limits, which did not embrace the business of selling their claims or interests therein. Upon this hearing, and in the opinion of the court, which is contained in the transcript, there has been no serious controversy with reference to any fact, and counsel differ respecting the application of the legal principles. The court erred in its conclusions of law upon the findings as they stand when corrected in accordance with this opinion. We have endeavored to ascertain the true guides for the settlement of these issues, and it is not necessary or proper to remand the case for a new trial.

It is ordered and adjudged that the judgment be reversed, and that the cause be remanded, with directions to enter judgment for the defendants.

*Reversed.*

HARWOOD, J., and DE WITT, J., concur.