# THE SUPREME COURT

## OF THE

# STATE OF NEVADA

## JANUARY TERM, 1908.

[No. 1723.]

## THOMAS J. COSTELLO AND LEONA K. NEWHALL, RESPONDENTS, *v.* MURRY SCOTT, N. R. FITZPATRICK, WILLIAM MAYS, AND L. A. SAVAGE, APPELLANTS.

1. JURY—RIGHT TO JURY TRIAL—EQUITY CASE. In an equity case, a party cannot demand a jury as a matter of right, the calling of a jury being within the discretion of the judge.

2. SAME—LEGAL AND EQUITABLE ISSUES. Where a suit to establish a partnership and for an accounting was treated by all the parties as an equitable proceeding throughout, and a jury was called to aid the court in determining certain questions of fact, but no jury was ever demanded to try the legal issues raised by defendant's answer, their right to a jury trial of such issues was waived, and the court was authorized to disregard the jury's conclusions on the facts, and to file his own findings and base a decree thereon.

3. MINING PARTNERSHIPS—CREATION. In a suit for an accounting of an alleged mining partnership and to establish plaintiffs' interest in certain mining claims discovered by defendant S., evidence *held* to sustain a finding that a partnership for the location and operation of mines existed between plaintiffs and defendant S., covering the locality in controversy, at the time the claims in question were discovered, and that plaintiffs were entitled to an interest therein.

4. SAME—GRUB-STAKE CONTRACT. A grub-stake contract, by which one agrees to furnish supplies for a prospector and share in any mining claims he may discover, does not constitute a partnership, unless the agreement extends beyond the mere furnishing of supplies in consideration of a participation in the discoveries.

5. SAME — CONTRACT — MODIFICATION. Plaintiffs and defendant. S. having formed a partnership for location and operation of mining claims, S., on May 4, 1906, wrote plaintiffs that he had arrived in F. and secured a two-thirds lease on certain property; that he would need $50 to carry on the lease, giving plaintiffs one-third or one-half thereof. Plaintiffs in reply on the 10th complained of their inability to raise money, but promised to send the same not later than the following Tuesday, and called for a description of the camp and lease. On May 19th plaintiffs wrote another letter, inclosing the $50, and again called for a full description of the lease and the claims S. had located between G. and F. *Held*, that such correspondence did not constitute a termination of the prior partnership between the parties, and a new contract to operate the leased ground, but contemplated a continuance of the prior relations between plaintiffs and S.

6. APPEAL — ADMISSION OF EVIDENCE — PREJUDICE. Defendant S. was not prejudiced by the admission of a letter in evidence in an equity suit, where its admission could not have changed the rights of the parties.

7. SAME. Where the question of partnership in issue was a matter of legal construction to be placed on prior correspondence between the parties, which, as found by the court, established a partnership, the admission of other subsequent letters, even though erroneous, because they contained self-serving declarations, was not prejudicial to defendants.

8. FRAUDULENT CONVEYANCES — NOTICE — EVIDENCE. Plaintiffs and defendant S., having entered into a prospecting partnership, S., while living with defendant F., located a number of claims, some in the name of plaintiff C., and S. and F., of which F. had knowledge, and later conveyed to F. surface town-site rights in land covering a number of claims' in controversy. F. testified that he first learned that plaintiff C. was interested with S. when he (F.) first went to G. *Held*, that such facts were insufficient to charge F. with notice of the existence of a partnership between plaintiffs and S.

9. APPEAL — FINDING OF FACT — CONCLUSIVENESS. A finding of fact in an equity suit, supported by the evidence, is conclusive on the supreme court.

10. MINES AND MINERALS — MINING PARTNERSHIP — CONTRACTS — PERFORMANCE. Where S., while a member of a prospecting partnership, located certain mining claims, and with others transferred town-site surface rights to F., in consideration of his performance of the location work necessary to hold the claims, and to survey and plat the same, neither plaintiffs nor S. were entitled to complain that F. subsequently made arrangements that such work should be done by another.

11. SAME — AUTHORITY. Where a partnership for the location of mining claims, etc., was practically without funds, a member of the firm was authorized in good faith to convey certain town-site surface rights embracing such claims, in consideration of the grantee's performance of the location work, etc., necessary to hold the claims.

12. PARTNERSHIP — ACCOUNTING — JUDGMENT. A receiver in proceedings for an accounting of the assets of a firm in which plaintiffs were entitled to a half interest with defendant S. became possessed of $1,816 belonging to the firm, and the final decree adjudged to plaintiffs against S.

the sum of $2,180.60, which sum included the .$1,816. *Held*, that such
judgment was erroneous, as in effect a double judgment for plaintiffs
for one-half of the $1,816.

13.  NEW TRIAL—ERRORS—CORRECTION—REMITTITUR.  Where a judgment for
plaintiffs in a suit for an accounting of a partnership was excessive
through mere oversight of the trial judge, and on an application for a
new trial plaintiffs confessed the error, and offered to remit the excess,
the court had power to deny the motion on plaintiffs filing a remission.

14.  APPEAL — REVIEW — DISPOSITION OF CAUSE.  Where a judgment was
excessive through misadvertence of the trial judge, the supreme court,
in the event of a denial of a new trial without requiring remission of
the excess, on its attention being called to the error, would modify the
judgment, and affirm the order denying the motion for a new trial, as
authorized by Comp. Laws, 3434.

15.  MINES AND MINERALS — MINING PARTNERSHIP — ACCOUNTING — DECREE.
Defendant S., while a partner of plaintiffs, located, with his two code-
fendants, certain valuable mining claims, which defendants transferred
to a corporation.  Plaintiffs then sued for an accounting, to which the
corporation was not a party, and a decree was entered giving plain-
tiffs an undivided half of an undivided third of the claims in question;
the decree also reciting that plaintiffs were entitled to an undivided
one-half of any and all further moneys or other consideration received
or to be received by S., or contracted to be paid to him, accruing or
arising out of any interest, property right, claim or demand of S. to
such mining claims, etc.  *Held*, that such decree did not attempt to
adjudicate plaintiffs' rights to stock in the corporation nor any of its
rights, and was therefore not objectionable as being a double judg-
ment, in giving plaintiff one-half of S.'s third in the claims deeded to
the corporation, and also one-half of all stock issued by the corporation
to S. in consideration of the transfer.

16.  JUDGMENT — CONCLUSIVENESS — PARTIES.  Where a corporation to which
certain mining claims had been transferred was not a party to a suit
for an accounting between plaintiffs and the corporation's grantors,
the corporation was not bound by a decree *establishing plaintiffs'*
rights as against such grantors.

17.  APPEAL — ADMISSION OF EVIDENCE — PREJUDICE.  Where, in a suit for
accounting between partners and others concerning certain mining
claims transferred to a corporation, the question whether a deed by
one of the partners of his interests in the claims to the corporation
conveyed the title so as to cut out plaintiffs' equities was not involved
nor attempted to be determined, the admission of such deed was not
prejudicial to defendants.

## ON PETITION FOR REHEARING.

1.  APPEAL—REVIEW—ESTOPPEL TO ALLEGE ERROR.  Appellants, by treating
a judgment as final and appealing therefrom, are estopped to deny its
finality.

2.  SAME—DECISIONS REVIEWABLE—FINALITY.  Where a judgment determined
the existence of a partnership, and ordered a dissolution thereof, gave
to plaintiffs an undivided half interest in certain property, determined
to have belonged to the partnership, and in the hands of the receiver,

gave judgment against the defendant for one-half of a certain sum less certain specified deductions, such sum having been received by defendant on account of the partnership affairs prior to the institution of the suit and the appointment of the receiver, and further allowing plaintiffs their costs taxed at a certain sum, it was a final judgment, though the right to make a supplemental decree was reserved by the court.

3. PARTNERSHIP — DISSOLUTION — ACTION — DECREE. Where, at the time a decree was entered dissolving a partnership, appointing a receiver, and awarding plaintiffs one-half of all moneys in the hands of the receiver, there was no showing of any partnership indebtedness, and the court proceeded on the theory that there was none, such judgment should be modified on appeal, that the claims of third parties be first paid out of the property in the hands of the receiver.

4. SAME — COSTS — DISCRETION OF COURT. The allowance of fees of the receiver as costs in proceedings for dissolution of a partnership is a matter in the legal discretion of the trial court.

5. SAME — APPEAL — MODIFICATION OF DECREE. Where a decree recited that the court deemed the appointment of a receiver for "the best interest of said copartnership," and then proceeded to impose all fees and expenses of the receiver upon defendants, such decree will be modified on appeal by directing that such fees and expenses be borne by the partners equally.

APPEAL from the District Court of the Second Judicial District of the State of Nevada, Churchill County; *B. F. Curler*, Judge.

Action by Thos. J. Costello, *et al.*, against Murry Scott, *et al.* From a decree in favor of plaintiffs, defendants appeal. **Modified and affirmed** as to all the defendants, except N. R. Fitzpatrick, and **reversed and new trial granted** on certain of the issues between plaintiffs and defendant Fitzpatrick. Petition for rehearing. **Denied.**

The facts sufficiently appear in the opinion.

*Thomas S. Ford, L. N. French,* and *T. W. Wampler,* for Appellants:

I. A cardinal principle of pleading and practice was violated in this case by entering judgment against the defendants upon the testimony produced. By the complaint, and the plaintiffs' theory of the case, the plaintiffs were to have supplied Scott with money. They claim that they did so, and they specify and base their rights to recovery on the allegation that, at the time of the discovery of the Wonder mines, he was living on money which had been supplied by them. Upon this allegation there was an entire absence of proof.

The contrary was established beyond all question of doubt. It will be noticed by the court that when plaintiffs concluded to sue defendants it became necessary to show that the contract extended outside of Goldyke District, and that they had furnished Scott the money he wrote for. They had promised to send fifty dollars to Fairview. Two of the main issues presented by the pleadings were these: (1) Did defendant Scott receive fifty dollars in currency alleged to have been sent by plaintiffs on May 19th, in a letter by mail? (2) Was Scott subsisting on the proceeds of this money on May 25th, when the Wonder mines were discovered? That it became necessary for plaintiffs to prove these facts will become apparent to the court, not only from an inspection of the pleadings, but from the law applicable to the case. As to the law, it is clearly set forth in the case of *Prince* v. *Lamb*, 128 Cal. 128., In that case the court says: "Neither can the complaint be upheld on the theory that it counts on a grub-stake contract. It is essential to a right in property under a grub-stake contract that such property should be acquired by means of the grub-stake furnished and pursuant to the grub-stake contract." The complaint does not show that the fifty dollars was used in procuring any portion of the property. (*Emery* v. *Mason*, 75 Cal. 222; *Miller* v. *Butterfield*, 79 Cal. 62; *Berry* v. *Woodburn*, 107 Cal. 512; *Gisua* v. *Mallory*, 84 Fed. 851). It will be thus seen that a grub-stake agreement is neither alleged nor proved unless plaintiff shows that the property was acquired by means of the money sent and received. That the counsel had this case in his mind when he framed the complaint is apparent from the allegations which specifically allege that this letter enclosing the currency was sent and received, and that Scott was subsisting on the money at the time of the discoveries alleged.

II.  Where the judgment is for too much, the case must be remanded for a new trial. (*Greenleaf* v. *Hill*, 30 Me. 165; *Frank* v. *Morrison*, 55 Md. 399; *Clark* v. *Robinson*, 15 R. I. 231; 10 Atl. 642.) And in those courts which hold that the appellate court may exercise such power, it will not do so when the judgment does not show what is the true amount to be paid. (*Seeman* v. *Feeney*, 19 Minn. 79; 5 Minn. 373; 18 N. Y. 522; 9 Misc. N. Y. 698; 30 N. Y. Sup. 257; 61 N. Y.

St. 114; 56 Wis. 221; 13 N. W. 925.)   In the present case the receiver is, by the judgment, ordered to render his account for settlement, and until such settlement and allowance of expenses,. fees, etc., the amount due cannot be ascertained. The supreme court will not undertake to readjust complicated matters of account for the purpose of reforming instead of revising a judgment.   (*Williams* v. *Durst*, 35 Tex. 421.) Actions for tort, in cases of excessive damages, where the amount is reduced, have no application to the present case. A district judge cannot alter, amend, modify, or correct a judgment entered or rendered by his predecessor, who tried the case.   (*Broder* v. *Conklin*, 78 Cal. 365; *Mace* v. *O'Reilly*, 70 Cal. 231.)   Upon this point we submit the motion for a new trial should have been granted, and we ask this court to order such new trial (unless it directs judgment in our favor without such new trial).

III.   Another error committed was the admission in evidence against defendants' objection of the deed by "Mays, Scott and Savage" to "Hidden Treasure Mining Corporation," a corporation, and also the finding of the court that the plaintiffs were entitled to an undivided one-sixth interest in the property of this corporation.   The deed was signed and delivered before the commencement of the action.   The corporation was an innocent purchaser.   There was no evidence of any *lis pendens* having been filed.   If there had been, it would only be notice to purchasers subsequent to the commencement of the trial.   The corporation purchased prior thereto.   The object of recording is to give notice to subsequent purchasers.   The deed was "valid and binding between the parties."   Plaintiffs did not purchase after the conveyance.   By paying full consideration without notice the corporation acquired the legal title, and also had the superior equity.   We are at a loss to understand the position of court and counsel in this matter, as an innocent purchaser cannot be deprived of his property this way.

IV.   The court below assumed, as a matter of course, in this case that it had the right to pursue the extraordinary course of summarily setting aside the verdict without pursuing the usual course, viz., entering judgment upon the findings of the jury, and thereafter reviewing the case on motion

for a new trial. In this the court committed error. The court assumed that all the issues were tendered on the equity side of the court. Such was not the case. The answer raised legal issues. The main portion of the judgment is devoted to granting legal relief. It affords money damages and possession of all the real property in litigation—purely legal remedies. The only way the judgment could or should be set aside was by ordinary motion for a new trial, in orderly and usual proceedings, subsequent to judgment. The case was tried as an action at law. Plaintiffs made no objection to calling a jury or submitting the case to them. As the record is silent the law presumes they were called by their consent. Out of twenty special issues plaintiffs prepared, fifteen, at their request, were submitted to the jury. They asked for the verdict upon these issues. If the verdict had been favorable to them they would not have objected. They waited until they found the verdict was against them, and then objected. We submit that a party cannot blow hot and cold in a court of justice on the same proposition. In this case the title and possession of real estate was asked for, and direct judgment given for its recovery. It could be recovered by writ of possession. Direct money damages were given. They can be recovered by execution. We have given bond to stay execution in the court below. All this relief was obtained in a court of law. Equity acts on the person—not the property.

V. Unless the case is of exclusive equitable cognizance, the right of jury trial remains. (*Muncie* v. *Martin*, 72 N. E. 882; 123 Fed. 506; 19 How. 271; 13 Wall. 616; 15 Wall. 373; 119 U. S. 347; 138 U. S. 151.) In all cases involving title to money or personal property either party is entitled to a jury as of right. (*Neff* v. *Manuel*, 97 N. W. 73.) Where issues of fact in an equity case are tried by jury and involve title or damages, the verdict is binding. (*Bowles* v. *Gandle*, 45 S. E. 835.) Where in an action in equity plaintiff tenders issues of damages, the defendant is entitled to a jury. (*Horton* v. *Simon*, 97 N. W. 604.) An action for breach of contract which involves an accounting is a jury case. (*Hoosier* v. *National*, 72 N. E. 473.) A party cannot, by giving an equitable form to a legal action, deprive his adversary of the

right to a jury trial. And legal questions in equity cases should be so tried. (*Curtis* v. *Sutter*, 15 Cal. 262; *Wiggins* v. *Williams*, 36 Fla. 637; 70 Ind. 490; 15 Mich. 322; 75 Mich. 274; 64 Pa. St. 275; 42 Pa. St. 488; 141 Ill. 308; 32 W. Va. 41; 82 Am. Dec. 530; 13 Am. St. Rep. 438; 73 Pa. St. 172.)

*McIntosh & Cooke*, for Respondents:

I. "A partnership formed for mining and trading in California, though not expressed to be for any definite period, will be presumed to be intended to last at least one mining season, and cannot be dissolved at will." (*Potter* v. *Moses*, 1 R. I. 430.) "A partnership for the accomplishment of certain definite objects, but not expressly specifying any time for its continuance, is not a partnership at will, within the meaning of the rule just stated, but it is regarded as a partnership to continue until its purpose is accomplished, or the impracticability thereof is demonstrated." (22 Am. & Eng. Ency. Law, 2d ed. 205, and note 5.) But as conclusive of the correctness of the court's finding we refer to the evidence. Scott says in his very first letter, December 8, 1905: "I am satisfied this will make a great camp in the spring. * * * We will come out all right in the spring. * * * This camp will be a hummer before many months."

II. The court did only what the established facts compelled it to do—found a general partnership for mining business. While such partnership was in law subject to be dissolved at will, "such a dissolution must have been made in good faith, on notice at a reasonable time, and without any unfair or selfish purpose, and without any purpose of thereby acquiring a private gain or advantage." (*Howell* v. *Harvey*, 39 Am. Dec. 376.)

III. "A subpartnership exists where one partner in an existing firm agrees to share his proportion of the profits with a third person in such a manner as to constitute himself and such third person partners. Such a contract does not violate the principle of *delectus personarum*, for it does not make such third person a partner in the original firm. The members of the principal firm have no interest in the controversy between members of the subpartnership." (22 Am. & Eng. Ency. Law, 2d ed. p. 17, notes 7–11, and cases cited;

George on Part. 75–79; *Burnett* v. *Snyder*, 76 N. Y. 344–349, 37 Am. Rep. 527; *Fitch* v. *Harrington*, 74 Am. Dec. 641; *Kerrick* v. *Stevens*, 20 N. W. 888; *Sears* v. *Collins*, 12 Mg. Rep. 400.) But independently of the legal effect of partnership relations, dissolution under reasonable time, conditions, etc., as elaborated on *supra*, we contend the evidence shows conclusively that at the very time Scott acquired the Wonder properties, he was actually subsisting on provisions, moneys and supplies furnished him by plaintiffs.

IV. Counsel concede the power of an equity court; that verdict of jury is merely advisory, but they claim the action of the court in declining to adopt the findings of the jury was an abuse of its power, claiming also that some of the findings made by the court were upon no evidence or "slight evidence." If the court has made such findings, counsel's remedy, instead of railing at the court for not adopting jury findings, is to ask for a new trial on the ground that the findings are wholly unsupported, and not complicate matters by injecting jury findings, which, in any view of the case, must be utterly foreign to the matter in hand.

V. The claim that the power of the judge to deny a new trial, should the prevailing party consent to a modification or reduction, is confined to damage cases and the like, is not correct under the authorities. (3 Estee, Pl. 485; *Pierce* v. *Payne*, 14 Cal. 420; Hayne, New Tr. and App. 166; 14 Ency. Pl. & Pr. 939.) The contention made by counsel has been before this court and decided adversely to counsel's position. (*Bonelli* v. *Jones*, 26 Nev. 176.) The California case of *Eames* v. *Haver*, 43 Pac. 1120, was an action involving an exchange of corporate stock, and the value of certain stock, which defendant refused to produce and deliver to the plaintiff. Judgment went for the plaintiff in the lower court, and on appeal it was found from the record that the sum of $525 represented an excess, or, as in this case, was included by error of calculation. The supreme court said, speaking of the lower court having granted a new trial for this error of calculation: "The order granting a new trial should be reversed on the conditions that, within ten days after filing of the remittitur in the court below, the appellant remit from the judgment the sum of $525, and pay all costs of this

appeal. * * * Perhaps the conditions that appellant pay all costs of the appeal would not be just if he had offered to remit the $525 in the lower court before a new trial was ordered." And this is exactly what plaintiffs did in the case at bar—offered to and did remit the alleged excess in the lower court before the court passed upon defendants' motion for new trial, and remittitur was made with approval of lower court, accepted by it, and thereupon motion for new trial denied.

VI. The decree is none the less final because some future orders of the court may become necessary to carry it into effect. It is not essential that the judgment settle all the rights of the parties. If it determines the issues involved in that particular action, it is a final judgment, though some future orders of the court may be necessary to carry it into effect. "The confusion has sprung up from failing to observe the distinction between the facts and things to be ascertained preparatory to final decree, and facts and things to be ascertained in execution of final decree." (*Perkins* v. *Sierra Nevada M. Co.*, 10 Nev. 405.) Where decree disposes of equities of case, the fact that it reserves jurisdiction to make some future order necessary to carry the decree into effect does not affect its finality. Where a final order as to the disposition of matter reserved can have no effect on the decree previously rendered, the decree is necessarily final, whether such reservation relates to the manner of carrying decree into execution or ascertainment of the state of the accounts between parties by reference in accordance with the equities by the decree. (13 Am. & Eng. Ency. Law, 28, 29.) A decree which decides all the equities involved is not rendered interlocutory because it concludes "all points and questions not herein expressly decided are reserved to the final decree." (*Jones* v. *Wilson*, 54 Ala. 50, cited in 13 Am. & Eng. Ency. Law, 28, note.)

*Thomas S. Ford*, *L. N. French*, and *T. W. Wampler*, for Appellants, in reply:

I. Where a case is tried in the court below upon the theory that the pleadings present particular issues, the appellate court will not adopt a different theory. (*Horton* v.

*Dominguez*, 68 Cal. 642; *Tully* v. *Trainor*, 53 Cal. 274; 20 N. Y. 58; 99 Mass. 256; 87 N. Y. 128; 11 Mont. 523.)

II.  A plaintiff must frame his pleading with reference to some particular theoretical right of recovery.  (*Logansport* v. *Uhl*, 99 Ind. 539.)  A complaint cannot be made elastic, so as to change to the bending views of counsel as the case proceeds.  It must proceed to the end, upon the theory upon which it is constructed.  (*Toledo* v. *Levy*, 127 Ind. 168.) The prayer of the complaint does not determine its character, and plaintiff cannot obtain relief upon a different theory from that on which his pleadings are based.  (*Hays* v. *Fine*, 91 Cal. 391; 62 N. Y. 508; 36 N. Y. App. Div. 159.)

III.  Counsel cites authorities to the effect that, in an equity case, the court should make findings.  Where the case is one of exclusive cognizance in a court of equity, this is true.  We did not deny the proposition involved.  We raised the point that where there was no evidence to sustain a finding, the making of a finding adverse to the verdict of a jury was an abuse of the discretion of the court.  Counsel says "in the absence of statutory modification, the jury is not a part of the chancery system." Comp. Laws, 3278, says: "Chancery cases may be tried by the court, with or without the finding by a jury, on issues formed by the court." It was held in 2 Nev. 75, that, where legal and equitable issues arise in the same case, a jury might properly try the legal issues. As to the legal issues in a chancery case, the verdict is not advisory. It is compulsory. Counsel cites a number of authorities to the effect that, in a chancery case, the court below must make its own findings. This is true, as we said, where the issue is purely one of equitable cognizance. But this is not true where there is an entire want of evidence upon any issue.

IV.  Counsel says that the petition for intervention injected new issues, but the court will note that the issue of its right to the property was tried against it, just the same as if it had been a party to the action. He further says the filing of the petition would necessitate delay in trying the action. We are at a loss to understand how that would result when its rights to the property were tried just the

same as if it had been allowed to intervene. But had the judgment of the lower court not attempted to foreclose the rights of the corporation, or adjudicate its title to its property, the action of the court, in denying it the right to intervene, might be considered harmless. But to deny it the right to be heard, and then to adjudicate its rights, is one of the most glaring and gross instances of depriving a party of its property without due process of law which this court ever had brought to its attention. This court will look through the record in this case in vain, to find out why the sales and options made by Scott, Mays and Savage to Rigdon and others were respected by the judgment and the action of the court below, and the sale made to the Hidden Treasure Company was made a mark of discrimination, and not only the interest which Scott formerly held in the real property, but the stock which Scott received for that interest, were both given to plaintiff. Why there should have been such discrimination and gross injustice cannot be explained by anything appearing in the record.

V. Counsel says that we filed our exceptions to the findings, and that is all we were entitled to do under the statute. Comp. Laws, 3858, says that exceptions shall be made in the court below, to the findings, and, "upon failure of the court below to remedy the alleged error," the party shall have his exceptions. We submit that this section makes this proceeding a part of the trial in the court below. It is no answer to say that the court below would have paid no attention to our exceptions, and made every finding against us. A party is entitled to a trial. He is entitled to a hearing, and without a trial and without a hearing his case has been erroneously and illegally decided, and he is entitled to a reversal of the case, so that he may be heard upon every question which the statute says that he may be heard, in the court below. By reason of not being given sufficient time by the court below, we were obliged to file our exceptions after judgment was entered and after the judge who heard the case had gone out of office.

VI. Counsel cites the case of *Bonelli* v. *Jones*, 26 Nev. 176, and claims that that is against us. Quite the contrary.

That was a case in which the judge who tried the case was the same person who made the conditional order that a new trial be granted. In that case the court granted an excessive amount of water, and, on motion for a new trial, ordered that the same be denied, provided the plaintiff accept a less amount. The ruling of the court was that the appeal from the order be dismissed, the court saying: "There is nothing before this court which can be considered." We submit that, under this ruling, any language of the court pertaining to the power of the court was mere obiter. Where this point was not before the court, and was not decided by the court, we submit that the decision should have no weight with this court; but, if we consider the decision and the language used, as if the point had been decided, we find that the question was whether the court could impose reasonable terms upon granting or denying the motion, and not whether the court could alter or amend the judgment, or make different findings. The authority there referred to (14 Ency. Pl. & Pr. 939) holds that the conditions there referred to concern the payment of costs, or that the new trial shall be confined to certain issues, or be confined to one of the defendants, or that appeal be waived. These matters were not judicial principles upon which the cases were determined. We call the court's attention to the case of *Anderson* v. *Rome*, 54 N. Y. 334, cited in the note to the text in that case, in which the court says: "Where legal error has been committed upon the trial, a new trial is a matter of right, and the court cannot impose terms." See also *Shaw* v. *McMaren*, 2 Hill (N. Y.) 417, there referred to. In the other reference made by the court in that case (Hayne, N. T. & App. 166) the result of the summing up of the authorities on the point is that the court can make the conditional order where the motion is made upon grounds which are "addressed to the discretion of the court below." The statue of this state gives the party the right to a new trial where there is (Comp. Laws, 3290) insufficiency of evidence and the decision is against law, or errors in law occurring at the trial. Where such errors have occurred, we submit that the party has such right as a matter of course.

*Thomas S. Ford, L. N. French,* and *T. W. Wampler,* for
Appellants, on petition for rehearing:

I.   The complaint does not allege community of title in
the property or the proceeds, but an undivided half owner-
ship in each.   There is no joint ownership which should
exist to constitute partnership.   A partner has a joint inter-
est in the whole, but not a separate interest in the whole, or
any particular part, of the property.   He cannot convey an
undivided interest in any particular piece of property.   The
coöwnership of property does not constitute partnership,
although they use it for making gains.   If property is pur-
chased for the purpose of reselling it and dividing the gross
receipts, the parties are not partners.   An agreement to
share the gross returns, as distinguished from the net
returns, does not constitute partnership.   All the authorities
agree on this.   The reason is that such an agreement cannot
possibly constitute the parties joint proprietors of the profits.
(Story on Part. 34; Lindley on Part. 4th ed. 16, 17; *Everett*
v. *Coe,* 5 Denio, 180; *Brown* v. *Jaquette,* 94 Pa. St. 113; *Walker*
v. *Tupper,* 152 Pa. St. 9; *Flint* v. *Eureka Co.,* 53 Vt. 669; 22
Am. & Eng. Ency. Law, 44, and cases cited.)   *Bradley* v.
*Harkness,* 26 Cal. 76, is a similar case to this.   In that case
the court says: "The complaint proceeds upon two legal
theories, which are wholly inconsistent.   It first alleges a
copartnership in general terms.   * * *   It then drops the
copartnership theory, and adopts that of a tenancy in com-
mon in real estate.   * * *   The pleader seems to have been
unable to determine which was the true theory, and * * *
concluded to partially incorporate both in his complaint,
being satisfied that one or the other must suit the facts to
be developed by the evidence.   * * *   This style of pleading,
if allowed, would lead to the most pernicious results.   All
correspondence between matters of allegation and matters
of proof would be dispensed with."   * * *   The court held
there was no cause of action.   On the death of one partner,
title vests in the survivor, but not so with tenants in com-
mon.   Profits is the excess of receipts over expenditures.
(*Connolly* v. *Davidson,* 15 Minn. 519; Story on Part. 36, note 3.)
If one share in the net profits, that will constitute him a
partner; if in the gross profits, then it will be otherwise.

(Story on Part. 34, 42, and cases cited.)   While the plaintiffs were paying expenses, plaintiffs and defendant were to share equally all gross profits and property acquired.   Such is the allegations of the complaint, and such relation does not constitute partnership.

II.   The judgment is void, and does violence to all principle and established precedent.   The judgment' in this case does not settle the partnership affairs.   It gives piecemeal relief upon some matters and leaves the final settlement uncertain and undetermined.   The decree should be definite and certain, and make a final settlement between the parties, so that execution may issue for the balance.   (*Filbrun* v. *Ivers*, 92 Mo. 388; *Honore* v. *Colmesmill*, J. J. Marsh, Ky. 525; *Griggs* v. *Clark*, 23 Cal. 428.)   The judgment in the case at bar is not a final settlement of the partnership affairs. Paragraph 16 gives plaintiffs judgment against defendant Scott for $2,182.60 upon which execution may issue.   This is also a separate judgment for costs of $936, also a separate judgment for one-half of the mining property.   There is no balance struck.   The judgment is for separate items of the partnership account.   In paragraph 18 the plaintiffs are given judgment for one-half of all moneys in the custody of the receiver, gross, and plaintiffs are entitled to have the same delivered to them (*eo instante*).   No account has been rendered by the receiver, who has possession of all the property.   We submit that this judgment is indefinite and uncertain, so much so that this court cannot permit its execution or attempted execution by the lower court.   It is to be executed piecemeal; in part by the delivery of specific real property; in part by execution upon separate items for money judgments; in part by the delivery of a divided one-half of money in the receiver's hands as against the claims of the receiver himself and the creditors of the estate, and those having prior charges against the property itself, to be paid out of those funds, where there is no balance struck as between the contending litigants.   Confusion must arise upon attempting to satisfy, by execution, the separate items, when the officer may levy upon the very property directed by the other part of the judgment to be delivered to plaintiffs.   The record does not show that the receiver possesses sufficient

to pay his own claims and expenses, and, if his account were
first settled, the court might direct to be paid to him, out of
the funds of the estate, such an amount that there could be
no independent judgment for separate money items. The
court might find it necessary to sell all the real property to
pay creditors or other claimants, and the sale of all the real
property and division of the proceeds is the usual and ordi-
nary method of settlement in partnership affairs. This court
will take special notice of the fact that the judgment was
prepared by the opposing counsel for the lower court and with-
out our knowledge or consent. The appropriate method of
procedure is to have the receiver's compensation and other
necessary expenses fixed by the court to be allowed out of
the assets in his hands. (High on Receivers, 1st ed. 796;
High on Receivers, 19, 20; 23 Ency. Law, 2d ed. 1119;
*Garniss* v. *Superior Court*, 88 Cal. 413; 11 Ency. Pl. & Pr.
935, 936.)

III. In the present case there are no means by which the
amounts can be made certain. The court must hold that an
account should be rendered by the receiver, and his expenses
allowed him. If the defendant is compelled to pay the whole
necessary expense involved in caring for the property since
the receiver came into the possession, one-half of which has
inured to the benefit of plaintiffs, it would be inequitable.
Settling a partnership account consists of discharging its
liabilities, collecting its assets, ascertaining the surplus, and
striking the balance. The receiver has the right of appeal
from the order settling his account. The relation of debtor
and creditor between partners cannot exist, and does not
arise while the affairs are being wound up, but only after all
the affairs are settled and the balance is struck. (*Ross* v.
*Cornell*, 45 Cal. 133; *Grant* v. *Los Angeles*, 116 Cal. 71;
*Gleason* v. *White*, 34 Cal. 258.)

IV. In this case the receiver claims a bill for $6,000.
Some of this is for annual assessment work on claims
adjudged by the decree to belong to plaintiffs and defendant.
Opposing counsel claim that we must pay the whole of this,
and that they are entitled to one-half of the whole of the
money in the receiver's hands. It is true their claim accords
with the reading of the judgment, but we must submit it is

clearly erroneous and unjust. We are also notified by the attorney for the receiver that one of the alleged creditors of the firm of Costello & Scott has, within thirty days last past, presented a bill to the receiver on firm account for over $1,800, alleged commission on sales of mining claims, and is about to commence suit. This loss, if suit should be successful, might fall entirely on appellant, as the present judgment would be then satisfied, and upon another judgment both would be jointly liable, and possibly, for some reason, appellant be compelled to pay the whole claim, whereas, if creditors were paid out of the assets of the estate, as they should be, all the partnership affairs would be settled in this case. The findings and judgment both proceed upon the theory that the interests of no person are involved except plaintiffs and defendant, and that they are tenants in common. We have but one appeal from the judgment. That we have taken. If this estate is distributed as now directed, we are without further remedy. We do not believe that such was the intent of this court in affirming the judgment. If so distributed, the plaintiffs will obtain more than they pray for in the complaint, and more than law or good conscience can sanction.

By the Court, NORCROSS, J.:

This is an appeal from the judgment and an order denying defendants' motion for a new trial. The action was brought by respondents, alleging a copartnership for mining purposes between themselves and defendant Murry Scott. They prayed for a decree dissolving the alleged copartnership, for the appointment of a receiver, for an accounting, and for other appropriate relief incidental to the dissolution of the copartnership. The nature and character of the copartnership between respondents and defendant and appellant Scott is alleged in the complaint as follows: "That on or about the 8th day of December, 1905, the plaintiffs and defendant made and entered into a contract and agreement in and by which it was then and there mutually stipulated, contracted, and agreed by and between said plaintiffs and defendant that they would engage together as copartners in the business of prospecting for, discovering, locating, leasing, acquiring and

working mines and mineral claims in the Counties of Nye and Churchill in the State of Nevada, and in such other counties and places in said state as might be subsequently agreed on; that said defendant should give his time and attention to said business, and should furnish his work, labor, and services necessary for the purposes of said business, and that the plaintiffs should from time to time advance and pay the expense of said business, exclusive of defendant's said labor, and until said business should become self-sustaining; that any and all property so discovered, located, or in any manner acquired by said defendant should be held and owned by said plaintiffs and defendant in common, each (that is to say, plaintiffs) having, holding, and owning an undivided one-half part, share, and interest therein, and the defendant having, holding, and owning the remaining undivided one-half part, share, and interest therein; that the proceeds of any and all sales, options for sales, working bonds, or leases arising from, or in any manner or wise accruing out of, said business and property so acquired should be divided, as aforesaid, between plaintiffs and defendant, share and share alike; that plaintiffs and defendant should have, hold, and own, as aforesaid, respectively, an undivided one-half interest of, in, and to any and all mines and mining claims located or otherwise or in any manner acquired in pursuance of said agreement or subject thereto, and should have, hold, and own an undivided one-half interest, as aforesaid, of, in, and to all profits, proceeds of sales or other consideration arising from the said business."

The answer of defendant Scott denies that he ever entered into any contract of copartnership with the plaintiffs Costello and Newhall, and denies that he had ever entered into any agreement or business relations whatever with the plaintiff Newhall. He further alleges that he and the plaintiff Costello did enter into "a (so-called) grub-stake agreement," which was confined exclusively to the Goldyke District, in Nye County. The nature of this agreement is set forth in defendant Scott's answer to be as follows: "By the terms of said agreement, the plaintiff Costello was to furnish money to this defendant, and with said moneys defendant was to purchase necessaries to support him, and materials for working

said mines, and the said contract was fully performed and carried out by this defendant; but the amount of moneys furnished by said Costello was wholly inadequate and insufficient for the purposes designated. The said defendant was to locate and acquire title to mines, and as far as he could, and his time permitted, was to do preliminary work thereon, required by the laws of Nevada to be performed within ninety days after location; and after being so located, and the title acquired, the said Costello and defendant were to be equal owners therein, and each was to own an undivided half thereof. The said understanding or contract had no other terms, and the said conditions, so described, constituted the whole thereof, and there was no agreement as to how long said contract should last, and no time was fixed when it should terminate; but it was mutually understood by and between the parties that said contract might be dissolved at the will of either party, when it appeared to him that the same became unprofitable, or for other reasons he desired to terminate the same, and the said agreement between Costello and Scott was dissolved and terminated prior to the time that the said business association or partnership of Mays, Savage, and Scott was formed."

It is alleged in the pleadings and shown by the proofs that on or about the 23d day of May, 1906, the defendant Scott, who was then at the Town of Fairview, in Churchill County, joined defendants Mays and Savage in a prospecting expedition. These three parties, two days later, discovered the mines of Wonder, about twenty miles from Fairview, which proved to be of great value.

The main contention, upon the merits in this case, is plaintiffs' claim to an equal interest with Scott in the fruits of his discovery at Wonder, by reason of the alleged partnership. The case came on for trial in Churchill County before the court, with the aid of a jury. Special issues were submitted to the jury, which, in the main, were answered in favor of the contention of defendant Scott. To the question, "Was the partnership or grub-stake agreement confined, or intended to be confined, to the Goldyke District, in Nye County?" the jury answered "Yes." Upon the question as to whether there was a partnership agreement, as contended

for by plaintiffs, the answer of the jury was in the negative. Also, in reference to the contention of plaintiffs that they had, shortly before the Wonder trip, sent him $50, upon which he was subsisting at the time of the said discovery, the jury answered in the negative. These may be regarded as the principal special issues submitted to the jury, and are sufficient to notice for the purposes of this opinion.

After the jury had returned its verdict upon the special issues submitted, respective counsel entered into a stipulation "that any and all further hearings, arguments, and proceedings to be had before the court in said cause may be had, heard, and taken before the court at Reno, in Washoe County, Nevada; * * * that an order may be made by the court for a change of venue in said cause for any and all purposes of said cause." The stipulation also contained another provision governing "any further accounting in said cause." Upon this stipulation the court entered an order transferring the cause to Washoe County, where the case was finally argued and submitted. Upon the 3d day of January, 1907, the court rendered its decision, in which it rejected the conclusions reached by the jury upon the special issues, and found in favor of plaintiffs' contentions, and entered a decree accordingly. Defendants' counsel filed exceptions to the findings of the court, and in due time moved for a new trial upon the grounds of errors of law occurring during the trial, insufficiency of the evidence to justify the decision of the court, and that the decision, findings, and judgment of the court are not supported by the evidence, but are contrary thereto. The motion for a new trial was heard by the successor in office of the judge who tried the case, and the motion denied. The case comes to this court in a transcript of nearly 1,400 pages, and the questions presented are ably and elaborately discussed by counsel in 350 pages of brief.

1. The first question, in logical order, is whether the court had power to set aside the verdict of the jury upon the questions of fact submitted to it, and substitute contrary findings of its own.

In a purely equity case, it is well settled in this state that a party cannot demand a jury as a matter of right. The calling of a jury in such a case is a matter of discretion with

the judge. "In such a case, when there are contested questions of fact, the chancellor may, and oftentimes should, call a jury to assist him in arriving at a just conclusion; but the verdict is merely advisory, and only to satisfy his conscience. If he is not satisfied with it, he can and should disregard it. If it is satisfactory, he can and should adopt it, and file his findings and decree accordingly." (*Duffy* v. *Moran*, 12 Nev. 97; *Lake* v. *Tolles*, 8 Nev. 290; *Van Vleet* v. *Olin*, 4 Nev. 95, 97 Am. Dec. 513.)

It is contended, however, in this case that the answer of defendant Scott raised a legal issue upon the question of the existence of the partnership, and that the finding of the jury upon this issue was controlling upon the court. Conceding that the answer did raise certain legal issues, it may be admitted that, if a jury had been called to try these issues, the court would not have power to disregard the verdict of the jury upon such issues, and make findings contrary thereto. But this is not the situation presented in this case. The jury was not called to determine the legal issues. The case was treated by all parties as an equitable proceeding throughout, and the right of the court to pass upon the legal, as well as the equitable, issues does not appear to have been questioned until after the jury brought in its verdict, and, so far as the record shows, not until after the trial judge had rendered his decision. The minutes of the court, included in the transcript, show that, after the argument upon and the disposal of the motion to discharge the receiver, the court set the case down for trial upon a day certain, "by the court with the aid of a jury."

Counsel for both sides were present when this order was made, and they are deemed to have consented to it. (*Haley* v. *Bank*, 21 Nev. 127.) The stipulation, which respective counsel entered into immediately following the verdict of the jury upon the special issues, shows, we think, that the trial was regarded as being by the court, with the jury simply in an advisory capacity. In the opinion rendered by the trial judge the following statement is made: "A trial was had before the court, a jury being called to assist the court in determining the questions of fact involved." It is manifest from this that the court understood the case to have

been conducted as a purely equitable proceeding—a matter that there could hardly have been any opportunity for him to have been mistaken upon.

Counsel cites *Van Vleet* v. *Olin*, 4 Nev. 97, 97 Am. Dec. 513, and quotes, in support of his contention, the following: "The court below treated the case all through as an ordinary action at law. When an action is so tried and treated by court and counsel, the law must be correctly submitted to the jury." The case cited was an equity case, which the court and counsel treated, so far as the trial was concerned, as an action at law. Applying the reasoning in that case to the present case, and it can with equal force be said that where an action presents both legal and equitable issues, but is treated by court and counsel as a purely equitable case, and a jury is impaneled simply in an advisory capacity, the court has the same right to disregard the findings of the jury upon the legal issues as it has to disregard those bearing upon the equitable issues.

Counsel cites many cases in his brief supporting the contention that, where legal issues are involved in an action, the party raising the legal issue has the right to have such issue tried by jury. In his reply brief counsel directs our attention to two decisions of the Supreme Court of California, cited in his opening brief, which he argues are entitled to the greatest respect, presumably because of the similarity of our code and practice with that of California. The cases are *Newman* v. *Duane*, 89 Cal. 597, 27 Pac. 66, and *Donahue* v. *Muster*, 88 Cal. 121, 25 Pac. 1096, 22 Am. St. Rep. 283, and in both these cases a jury was demanded to try the legal issues, which demand was denied by the court, and exception taken. In this case a jury was never demanded to try the legal issues, and, therefore, the cases cited are not in point. Whatever right defendants may have had in this case to a trial by jury of any issues raised by answer, such right was waived by failure to demand a jury trial thereof, and by consenting that the case be tried by the court with the aid of a jury, as in a purely equitable case. The court had the right to disregard the conclusions of the jury upon the facts. Upon appeal the main questions presented are whether the findings of the court are supported by the evidence. (*Harris*

v. *Lloyd*, 11 Mont. 390; 28 Pac. 736, 28 Am. St. Rep. 475; *Stockman* v. *Irrigation Co.*, 64 Cal. 67, 28 Pac. 116; Hayne on New Trial and Appeal, 234.)

2. The principal questions upon the merits involve a determination of the contractual relations, if any, existing between the plaintiffs and defendant Scott at the time of the discovery of the Wonder mines. This relationship must be determined, in the main, by correspondence had between the parties during the month of December, 1905, and following. On December 8, 1905, defendant Scott wrote to plaintiff Costello as follows: "No doubt you will be somewhat surprised when you open this letter to see it is from me. * * * Well, Tom, if you feel like staking me here, I think I can get some very valuable ground here. * * * If you desire to stake me, you will have half interest in all the claims I locate. If you can spare the money, I think it will be a great investment for both of us. * * * If you desire to stake me, do not say anything to any one about it, and we will come out all O. K. in the spring. The camp will be a hummer before many months. If I could have only seen you when you was here, I know everything would have been all O. K. * * *"

To this letter the plaintiffs, on December 14th, replied as follows: "Your letter received, and will say in answer that we have practically exhausted our own means, but we are in correspondence with several parties from whom we expect some help. If they come through, we will at once come to your assistance. We could have done business in the summer and fall easily, but at that time you were tied up with other parties, and I am glad to see you have gotten some very nice properties for them, and we have no doubt but what you will be able to find other good properties in the future. Now, when you answer this, let us know what you need. Then, if things come right with us, we will be able to advise you at once."

On December 24th defendant replied as follows: "Everything is looking fine here. They have made a new strike at the Goldyke that is very good, they say. I have been prospecting the hills since you was here, and have made some very important finds. I have my eyes on some claims that

I think will be very good property.  Some fellows have the ground located, but I know they will not do any work, and I will get the property.  * * *  I have panned some of the rock, and it pans very good.  I have four claims here.  They are side claims of the Idahoes, the claims that we made the strike on.  They are very good property, and I am willing to hand you over half if you can handle them; but in the meantime I would like to do some work on them, so I can show them up to the best advantage.  I think we can make some money here if we form a partnership.  I will get the properties if you can dispose of them, and some very good · ones at that.  In regard to what I will need to keep me going, about all I will need at present will be grub.  I have plenty of tools to do all the work that I will do.  You know about what it will cost.  I think this will be a chance for both of us to make some money.  I think this new find of mine will be another Goldyke.  It has the earmarks of being a fine property.  Well, Thomas, let me hear from you at once. so I will know what to do.  I will close.  Yours, as ever."

To this letter plaintiffs replied, December 30th, as follows: "Your very welcome letter received several days ago, and we assure you we appreciate your position, but you can rest assured we are doing all in our power to help you, but will tell you right now money is a darn scarce article here in Tonopah.  But we have written to several different parties, and we have every reason to believe that at least two of them will come through.  * * *  Money will be rather close with us for perhaps the next sixty days, or until such time as we get returns from our correspondents.,  Now, here is what we would like to have you do.  Of course, you understand, we are willing to go in partnership with you, and you also understand, old man, we will have to depend on the outside for money to carry on operations until such time as we get a company floated.  So we would like for you to send us a diagram of the best thing you have; tell us about the veins— their width and values and formation; also whether it is a sinking or tunneling proposition.  Now, it is our candid opinion that although it will take a little while to get things started right, of this you may feel sure, if you go into this

partnership with us, we will all make money. So you go ahead, and get ahold of the best propositions you can, and get them in such a way that Bemis and Turpin will not be able to complicate matters with us. We will float them, as people are beginning to get a little excited over the Goldyke country. You keep us posted from time to time, and we will do our share by keeping you supplied with money to the best of our ability. Please find inclosed $40. Do the best you can with this amount, as you know we will do better as conditions admit, etc. Your friends."

On January 5, 1906, defendant replied as follows: "Your welcome letter was received this morning. * * * I have four claims joining the Idahoes, and I have been doing the assessment work. * * * I will send you the papers in my next letter, and you can put them on record. I only have my name on the location papers, but you can put your name on when you record them. As soon as the snow goes away, so I can see the ground, I will begin to russel the hills. * * * I am satisfied we will make some money here this year. As soon as the snow goes, I will locate all the leges on these claims, and write you all the particulars. I received your check and it will come in handy at present. Well Tom, I will do my best out here, and I think we will not be very long doing some business."

On January 21st the plaintiffs wrote defendant as follows: "What is the matter, old man; we have not heard from you for quite a while. We have several people on string, and would like to know what you have that we can offer them; so we think it is advisable for you to let us know at your earliest convenience, as we are extremely anxious to keep in touch with these clients. Send diagrams, extent of veins, formation, and how far from Goldyke, and direction, and a general opinion as to their value, and whether they are sinking or tunneling propositions, water, etc. Mining conditions are looking up quite favorably, and it is quite certain we will do a considerable business during the coming summer. By the way, we wrote you on the 30th of December, inclosing a check for $40. Please let us know if you have received same, as we have not heard from you since that time. * * * "

On February 2d defendant replied as follows: "I cannot

see why you did not get my last letter. * * * I will send some location papers, * * * and you can put them on record. * * * I think we will be able to sell them this summer. * * * I located them because they were so close in to the Idahoes, and I am sure we will get some money for them. I will have plenty of good ground before very long. I have been digging for water here, and I will have plenty of water in a few days."

On the same date, February 2d, plaintiff wrote defendant as follows: "We only received your letter of January 5th yesterday. * * * Please address in future Costello & Newhall, Box 866, Tonopah. * * * We are glad to hear the good reports from that section, and agree with you that there are good chances for us to make some money out there during the coming season."

On February 7th plaintiff Newhall wrote defendant as follows: "Your favor of February 2d, with location notices received last night, and I filed the notices for record this morning. Mr. Costello is at Crow Springs, and will not be in until the night of the 13th. We expect to collect some money between this and the 15th, and will send you some just as soon as we can receive it."

On February 26th plaintiffs again wrote to defendants as follows: "We have been trying for the past three weeks to get rid of some stock in order to raise some money. * * * By the way, when you answer, please let us know what kind of showing there is on the four claims we have had recorded, and what you think they are worth, as it is possible we might get some one interested. We understand from the papers that there are quite a number of good strikes being made around Goldyke, and hope the reports are true. You will find inclosed money order for $25. We promised to help you out by the 15th, but it was impossible to do so."

Answering the foregoing letter on March 14th, defendant after acknowledging its receipt, and writing at some length describing properties located and the general outlook of the camp, continued as follows: "Burns north of us has some very fine rock and he is going to lease his ground and I am going to take a leice and I think we will shurely make some money out of the leice he has rock that you can see all kinds

of gold in if Burns ground prooves good this camp will be all O. K.  I will take the leise when he lets them because if any of the leices prooves good we will be able to sell our leice for some money.  We had an offul snow storm last night.  I will write you agin in a few days and let you know all about the claims I will have and the leice.  * * *"  On March 21st defendant again wrote relative to some claims which he had relocated, and which were in dispute, and requesting the opinion of plaintiff Costello as to the legality of the location.  Closing, he says: "This camp will surely come to the front and we will be in the swim."  This letter was answered March 27th, giving defendant the advice asked for, and inclosing a money order for $25.  The letter concludes: "Try and keep us well informed how matters are progressing."

On April 5th defendant wrote plaintiffs as follows: "Your letter received and will say in reply that I was very glad to heare from you.  I am glad also to know that I have the claims.  I would like to see you come out here.  I think these claims would be a good stock propersition one of the best in this district, something that will stand a show to make a mine.  We have that Gold Dyke ledge shure.  Know is the time to do something for this camp is coming to the front shure this summer.  I think it would a good idie to stok this property if you are in a position to do so.  We are still having snow here but I think that we will have some nice weather soon.  Evry thing is looking good out this way. I have your check Well Tom I would like to see you out this way as soon as you can do so.  * * *"

A few days after writing the letter last above mentioned, the defendant Scott went to Tonopah to see plaintiffs personally.  The evidence is conflicting as to the conversation had between them.  The court accepted as true the version given by plaintiffs, and as the trial court is the exclusive judge of the credibility of the witnesses, its action in this respect is binding on this court.  The plaintiffs testified to the effect that, at this conversation in Tonopah, the Burns lease was discussed, and that it was agreed between them that the lease should be taken, but that it was not contemplated that the parties should work the same to any considerable extent.

It was to be taken principally for the purpose of getting it in shape, and transferring it to others at a profit. At this conversation, also, the project of prospecting the south end of the Fairview Range was discussed. At that time Costello drew a diagram of that section of the country, and stated to the defendant that he had seen some very rich float that was reported to have come from that country, and that he would like to have the same prospected, and that it was agreed between them that the first matter to be taken care of was the obtaining and putting in shape of the lease, and that thereafter some prospecting should be done in the south end of the Fairview Range. Upon this trip plaintiffs gave defendant $25 on account of his expenses.

Scott returned to Goldyke, and on April 18th wrote to plaintiff Costello as follows: "I arrived home. I am not going to take the Leise. Burns would not do as he agreed to and I think we had better not have anything to do with him. I know he has a great mine but he will not do the wright thing by a Leice and I will not take one. He promised me before I went to Tonopah that he would give me 9 months and transfurable but he has changed his mind and onley wants to give me 6 months and not transfurble and I do not want the Leice on those terms because that would not give us a chance. I am going out prospecting and will be away about three weeks out about 15 or 20 miles from here. I saw some rock from this place yesterday and it was great rock. I will do some work on some of our claims here when I come back if I do not find anything on this trip. The camp is looking good. We will make some money this year I am sure. They are making some good striks on the Gold Dyke extension."

Defendant next writes, on April 30th, from a place called Snow Point, to Costello as follows: "I am out prospecting between Atwood & Fairview. This is a verry good country to prospect in. I am about eighteen miles from Fairview. I have been here two days. Two fellows here has some very fine rock and I have some claims joining them and I think I will stay here for some time. I will be in Atwood in about two weeks. This is a fine looking camp and I think it will be a good one. * * *" On May 4th the defendant wrote to

plaintiff Costello from Fairview.  This letter was lost, but its substance was testified to by Costello as follows: "That he [Scott] had arrived in Fairview; that the country looked very good; he had done a little prospecting while going in; that he had secured a lease—a two-thirds lease—on a piece of property close in to the big strike; that he would need fifty dollars to carry on the lease; that he would get the two-thirds of the lease, giving me one-third, or one-half in the lease." On May 10th plaintiffs replied to this letter as follows: "Your very welcome letter reached us yesterday.  We will have to beg you to wait until between now and Tuesday, during which time we will be able to raise the money you asked for.  We are caught short owing to the trouble in California. * * * You can rest assured we will have money up there, leaving here not later than next Tuesday.  Please write us a good description of that camp and the lease you have taken hold of.  This letter will be handed you by Mr. J. W. Langley or his business partner, Mr. Trimble.  It will do no harm to let them see what we have, and there is a possibility that at a later date they may be of assistance to us."

The foregoing is all the correspondence which is admitted by both parties to have been written and received before the Wonder discovery.  Plaintiffs testified that on May 19th they wrote to defendant, inclosing $50 in currency, asked for, a copy of which letter was admitted in evidence.  Defendant Scott denied he had ever received the letter or the $50.  The court found that the letter and money had been received by Scott, and that Scott was subsisting thereon at the time of the Wonder discovery.  On May 23d Scott, together with defendants Mays and Savage, left Fairview on a prospecting expedition, and two days later discovered and located the Wonder mines, twenty miles north of Fairview.  After the discovery of the Wonder mines there was no further correspondence upon the part of Scott with the plaintiffs.  Plaintiffs wrote three letters to Scott after the Wonder discovery was known, which were admitted in evidence over defendant's objection, and will hereafter be considered.  It is the contention of the defendant Scott that the correspondence had between himself and plaintiffs during the month of December, 1905, shows but a grub-stake agreement, appli-

cable only to the Fairplay District; that plaintiffs failed to keep their part of the contract to supply defendant with necessaries, and that the agreement was terminated about the time Scott left Goldyke, in April; that if the agreement was not so terminated, then it was terminated by the new contract entered into at Fairview in respect to the lease.

" 'Grub-stake' contracts have sometimes been called prospecting partnerships, and are said to partake of the character of 'qualified partnerships.' Yet, unless the agreement goes beyond the mere furnishing of supplies in consideration of a participation in the discoveries, the word 'partnership' is improperly used and is misleading. It is simply a common venture, wherein one, called the 'outfitter,' supplies the 'grub,' and the other, called the 'prospector,' performs the labor, and all discoveries inure to the benefit of the parties in the proportion fixed by the agreement. The prospector has the right to insist on the outfitter performing his part of the agreement as a condition precedent to participation in such discoveries. Should he fail to do so, the prospector may discover and locate for his own advantage, free from any obligation to the outfitter. * * * Is it essential to a right in property under a grub-stake contract that such property be acquired by means of the grub-stake furnished, and pursuant to such contract? * * * The 'grub-stake' contract, properly speaking, applies to the search for and location of mines on the public domain. * * * We frequently encounter cases where the object of the venture is not only to search for and discover mines, but also to work and develop them, and conduct a general mining business. This is something more than a 'grub-stake' contract. Such an agreement constitutes a partnership." (Lindley on Mines, 2d ed. vol. 2, sec. 858, p. 1565, *et seq.*)

We think a fair interpretation of the letters which passed between plaintiffs and defendant Scott warrants the construction placed upon them by the trial court, that they show that the parties in question engaged in a partnership *in præsenti* for mining purposes. If the letter of December 8th contained the only proposition upon the part of the defendant, and the proposition therein contained had been accepted without modification, it would have constituted simply a grub-

stake agreement. The answer to this first letter informs defendant that plaintiffs have practically exhausted their means, but that they are in correspondence with several parties, and if they "come through," they will at once come to his assistance. The letter concludes: "Now, when you answer this, let us know what you need. Then, if things come right with us, we will be able to advise you at once." To this letter defendant makes a proposition of what he proposes to do. He informs plaintiffs that he has already been prospecting the hills, and has "made some very important finds." He also knows of some valuable locations that are shortly to expire, and he will "get them." He has four claims already located, which he is willing to turn over a half interest in if plaintiffs "can handle them," but in the meantime he proposes to do some work upon them, to show them up to a better advantage.

The gist of the proposition made by defendant is embodied in the two sentences contained in this letter: "I think we can make some money here if we form a partnership. I will get the properties if you can dispose of them, and some very good ones at that." He states in this letter that about all he will need will be grub, as he has plenty of tools. He requests a reply to this letter, so he "will know what to do." In the letter of December 30th plaintiffs accept the proposition, which both parties style a "partnership," and which constitutes a partnership in law. Plaintiffs, however, explain in their letter that they have to "depend on the outside for money to carry on operations until such time as we get a company floated." They say to defendant in this letter: "You go ahead, and get hold of the best propositions you can. * * * We will float them." "You can keep us posted from time to time, and we will do our share by keeping you supplied with money to the best of our ability." The contract is clear from these two letters. Defendant, who is a practical miner and prospector, is to get hold of good properties, some of which he already has and others he has in view. These properties the plaintiffs, who are stockbrokers, and in the business of selling and promoting mining properties, are to dispose of. The parties are to have an equal interest in all mining property acquired by defendant and the proceeds of any sales effected

by plaintiffs, or an equal interest in any stock companies organized to handle such properties. The subsequent correspondence shows that defendant was satisfied with the proposition that plaintiffs, "to the best of their ability," were to keep him supplied with money. No definite time was fixed for this partnership to last, but the court properly held that it was the intention of the parties that it was to continue at least into the summer of 1906, for that was the time frequently referred to, when they would "surely make money" out of their venture.

It is very earnestly contended by counsel for appellant that the contract entered into between Scott and the plaintiffs had reference only to the Fairplay District, in which Goldyke and Atwood are situated. Although the earlier correspondence between the parties refers only to this district, there is no specific declaration that their operations are to be confined to that district. It is common knowledge that where parties enter into grub-stake agreements, or general partnerships for mining purposes, they care very little about the place where the mines are found. The main thing which the parties to this partnership wanted was mining properties of sufficient promise and value to enable them to be handled so that money could be made out of them. That the parties did not intend to confine their operations exclusively to the Fairplay District is shown by their conversation in Tonopah, when plaintiff Costello pointed out the advisability of prospecting the south end of the Fairview Range; by the letter of defendant of April 18th, when he notified plaintiffs that he was going on a prospecting trip fifteen or twenty miles from Atwood, and would be gone about three weeks; by the fact that defendant testified that the grub purchased for this prospecting trip should have been paid for by plaintiffs; by defendant's letter, written April 30th from Snow Point, in which he says: "I am out prospecting between Atwood and Fairview.  *  *  *  I will be in Atwood in about three weeks"; by defendant's letter from Fairview of May 4th, relative to the lease at that place, and plaintiffs' reply thereto of May 10th.

3. It is contended by counsel that defendant's letter of May 4th, informing plaintiffs that he could receive a two-

thirds interest in a lease at Fairview, and plaintiffs' letters
of May 10th and 19th, respectively, in reply thereto, created
an entirely new contract between the parties, and terminated
whatever contractual relations previously existed between
them.  Plaintiffs' letter of May 10th is very brief, and there
is nothing in it that would indicate a thought upon the part
of plaintiffs that their previous relations were to be termi-
nated by the taking of the lease.  The letter is written as
though plaintiffs understood that the lease had already been
taken.  They say: "Please write us a good description of
the camp and the lease you have taken hold of."  This is the
only direct reference to the lease in the entire letter.  It is
not likely that parties would sever old relations and form
new ones without a more extended discussion of the matter.
The letter of May 10th contains but fourteen lines, and
treats the lease proposition as though it was an ordinary
business matter between them.  In the letter of May 19th
plaintiffs say: "We finally made the riffle, and you will find
the fifty dollars asked for inclosed herewith. * * * Please
give us a full description of the lease you have taken hold of
and your opinion of the camp in general.  And by the way,
you had better give us a description of the claims between
Goldyke and Fairview."

Defendant Scott denies that this letter of May 19th was
ever sent or received.  His counsel in his brief on appeal
says: "Assuming that the letter of May 19th was written
and sent, what is the result?  Plaintiffs are bound by the
last meeting of the minds of the parties.  A specific, defined,
and unambiguous agreement was entered into between the
three, not intended or contemplated by the original contract,
and it is the only one existing after May 19th, and must con-
trol this case.  Offer and acceptance made by letter create a
mutual obligation, and form a valid contract."  If this letter
was neither written nor received, then the contract in regard
to the lease could never have been effected, for the necessary
money was not forthcoming.  If the letter was written,
whether received or not, it shows that plaintiffs had no idea
of terminating the relations previously existing between
plaintiffs and Scott, for in that letter they ask for a descrip-
tion of the claims located by defendant between Goldyke and

Fairview. There is certainly no act shown, upon the part of plaintiffs, prior to the Wonder discovery, indicating any desire upon their part to dissolve the partnership. The evidence shows that they had been doing their best to carry out their part of the agreement, even though they had not met with any marked success in the disposal of mining property. They had contributed money to Scott "to the best of their ability," and apparently to Scott's satisfaction, for he is not shown to have complained to plaintiffs that they were not doing enough, or were not complying with their part of the agreement.

The evidence in this case shows that, up to the time of the Wonder discovery, the parties had reposed mutual confidence in each other. Scott knew that money was not easy with the plaintiffs. They frankly explained to him their financial situation in the very beginning of the transactions, and Scott was satisfied. Scott knew, as did every one, that the San Francisco disaster made money tight in this state for some time thereafter, and this situation is referred to in plaintiffs' letter of May 10th. In all the correspondence between the parties from December, 1905, to May, 1906, inclusive, there is not a line or a word indicating a severance of the contractual relations which they had entered into. After Scott made the Wonder discovery, he ceased all communications with plaintiffs. When one party to a partnership for mining purposes makes a discovery which would be of great value to the partnership, courts will not look with favor upon any contention upon the part of such discoverer that the partnership relations had previously been severed, unless such severance is clearly established. In this case the contentions of defendant Scott, based upon the correspondence alone, and independent of the other corroborative testimony in the case, fails to have any convincing force.

4. The contention of appellant that the evidence does not support the finding of the court that plaintiffs' letter of May 19th, together with the $50 alleged to be inclosed therein, was received, in the view we take of this case, is immaterial. The trial court in its decision analyzes the evidence upon this question of fact, and we could not, under well-

established rules, disturb such finding unless it was clearly against the evidence. But, conceding for the purpose of the argument that it was unsupported by the evidence, it would not be prejudicial to defendant, for plaintiffs' right to recover in this case is based upon the contract entered into by the parties in December, 1905, and this letter of May 19th, whether received or not, could not alter the terms of that contract, or affect the rights of the parties arising thereunder.

5. The court admitted in evidence, over defendant's objection, three letters written by the plaintiffs to Scott, of dates June 23, July 15, and July 16, 1906. It is claimed the evidence shows these letters were never received; that they contained self-serving declarations supporting plaintiffs' contention of the existence of the partnership. The court found as a fact that these letters were received. Conceding, without deciding, that the court erred in their admission, the error, if any, was harmless, for the letters only tended to support plaintiffs' contention of partnership. The question of partnership was a matter of legal construction to be placed upon prior correspondence. We have already construed this correspondence to establish a partnership. The letters in question could add nothing to the proof of the existing contract.

6. Plaintiffs allege in their complaint: "That subsequent to the 25th day of April, 1906, as plaintiffs are informed and believe, and so aver the fact to be, the said defendant, together with the said L. A. Savage and William Mays, became the owners of the possessory title of the Wonder town site in the said mining district, County of Churchill, and State of Nevada, by virtue of a discovery of mineral and the location thereof as quartz claims, the number and a more particular description of which plaintiffs are unable to give; that as plaintiffs are informed and believe, and so aver the fact to be, for the purpose of cheating and defrauding plaintiffs of their share and interest of, in, and to defendant's one-third interest in the said town-site location and claims, the defendant transferred and released, without a valuable or any consideration, his said undivided one-third interest therein to said codefendant, N. R. Fitzpatrick, who then and

there took the same, with full knowledge of defendant's said fraud, and of the plaintiffs' rights and equities in and to the same, and subject thereto."

Plaintiffs pray for a judgment and decree "vacating, annulling, and setting aside the release or conveyance made by defendant to said codefendant N. R. Fitzpatrick as to the plaintiffs' undivided one-half of the premises affected thereby."

Defendant Scott's separate answer contains the following allegation and denial: "Defendant admits that the said firm of Mays, Savage & Scott became the owners of possessory title of the Wonder town site. He avers that the mining claims on which said town site exists were located by the firm; that no mineral has been discovered thereon up to present date. The surface of said located claims was segregated from the mineral, and it was agreed by said firm that the surface should be occupied for town-site purposes. An agreement was entered into by which certain parties should promote the sale of town lots on said town site, but the said agreement reserved all of said claims except the surface to the locators. The defendant Murry Scott transferred to said Fitzpatrick his interest in said surface in consideration that said Fitzpatrick would, among other things, promote the building of a town site, and thereby enhance the value of defendant's mining property, and in further consideration of indebtedness existing on the part of defendant to said Fitzpatrick, for as much as the said Fitzpatrick had given defendant shoes, food, and other necessaries, by which he was enabled to sustain life, during a portion of the said time that the said Costello had agreed to furnish him with food and necessaries, and which he had neglected to do. Defendant denies that the said transfer was fraudulent or without any consideration, and avers that at the time the same was made the property had nothing but a prospective and speculative value, and it was not known that any town would ever exist thereon."

The separate answer of Fitzpatrick, Mays, and Savage contains the following allegations and denial: "Defendants deny that said Murry Scott transferred to defendant Fitzpatrick his interest in the said surface claims comprising the town-

site group without consideration. Deny that said transfer was made for the purpose of cheating and defrauding the plaintiff. Aver that the said transfer was made for a valuable consideration. That prior to the formation of said partnership of Mays, Savage, and Scott, the said Scott was without the necessaries of life, and the said Fitzpatrick furnished and delivered the same to Scott, and he was under financial obligation to him for so doing, and the properties of defendants was without any real present value, but its value was speculative, and was no more than sufficient to compensate the said Fitzpatrick for money advanced by him. Defendants further aver that a large portion of said town-site group for the proceeds of the sale of which an accounting is asked for was separately located by defendant N. R. Fitzpatrick, and he was and is the owner thereof by virtue of acquiring the same in his own name under the mining laws of the United States."

The court found that the transfer by defendant Scott to his codefendant Fitzpatrick of all the rights of Scott to the surface of claims of which he was a locator was fraudulent, and such transfer, in so far as it affected a sixth interest in the town site, was set aside, and plaintiffs decreed to be the owners thereof, and judgment given against Fitzpatrick for one-half of the proceeds derived by him from a sale of lots in said town site of Wonder.

Appellants contend the evidence is insufficient to support the finding that the transfer was fraudulent. Discussing the question of the evidence requisite to establish fraud, this court, in the case of *Gruber* v. *Baker*, 20 Nev. 476, 9 L. R. A. 302, said: "A party alleging fraud must clearly and distinctly prove the fraud as alleged. If the fraud is not proved as alleged, relief cannot be had, although the party against whom relief is sought may not have been perfectly clear in his dealings, for fraud will not be carried by way of relief one tittle beyond the manner in which it is proven. The rules of evidence are the same in equity as at law, and when certain facts as proved amount to a fraud is a question for the court. But the court is not justified in finding such facts upon any less or different kind of proof than would be required to satisfy a jury, for the law in no case will presume

fraud. The presumption is always in favor of innocence, and not of guilt. In no doubtful matters should the court lean to ,the conclusion that a fraud has been committed, nor should it be assumed on doubtful evidence. The facts sufficient to establish a fraud should be clear and convincing. Circumstances of mere suspicion will not warrant the court in coming to the conclusion that a fraud has been committed. We do not wish to be understood as holding that, in order to establish fraud, it requires direct or positive proof; for in matters that regard the conduct of men the certainty of mathematical demonstration cannot be expected or required, and much of human knowledge on all subjects may be inferred from facts that are established. Care should be taken, however, not to draw conclusions hastily from premises that will not warrant it; but if the facts established afford a sufficient and reasonable ground for drawing the inferences of fraud, the conclusion to which the proof tends must, in the absence of contradiction, be adopted. The motives with which an act is done may be, and often are, ascertained and determined by circumstances connected with the transaction. Various facts and circumstances evince sometimes, with unerring certainty, the hidden purposes of the mind; therefore, fraud may be shown by circumstances. But when the evidence, whether it be direct or circumstantial, is so strong as to produce conviction in the mind of the judge of the truth of the charge, it will be sufficient. This we take to be the extent of the rule that fraud must be proved. But this does not authorize the finding of fraud on less than a preponderance of the evidence, taken as a whole, for it is difficult to see how any disputed question of fact can be found except by the greater weight of evidence. The difference in the weight may be slight, but, unless it preponderates on the side of the plaintiff, the matter in dispute cannot be said to be proved; and this rule is adhered to more strictly in actions of this character than in any other class of civil cases, for it is said that, while the law abhors fraud, it is also unwilling to impute it on slight and trivial evidence, and thereby cast an unjust reproach upon the character of parties. What amount or weight of evidence is sufficient proof of a fraud is not a matter of legal definition. The proof, how-

ever, must be satisfactory. It should be so strong and cogent as to satisfy the mind and conscience of a common man, and so to convince him that he would venture to act upon that conviction in matters of the highest concern and importance to his own interest. It need not possess such a degree of force as to be irresistible, but there must be evidence of tangible facts, from which a legitimate inference of fraud may be drawn. As an allegation of fraud is against the presumption of honesty, it requires stronger proof than if no such presumption existed."

The trial court based its finding that Fitzpatrick had notice of the partnership relations existing between plaintiffs and the defendant Scott upon the following, as shown by the opinion of the court: "It further appears from the evidence in this case that Fitzpatrick lived with Scott in Goldyke District, Nye County, Nevada, at the time that Costello & Newhall were furnishing Scott with money, and at the time they were engaged with him in the mining business at Goldyke. It further appears from the evidence that Fitzpatrick was living with Scott at Goldyke from the 16th or 17th of March, 1906, up to the time that the defendant Scott left Goldyke for the Fairview country. It also appears from his evidence that he learned of the relations existing between defendant Scott and Costello at the time he first went to Goldyke, about the 16th or 17th of March; that during the time he was at Goldyke, claims were located in the name of Scott, Fitzpatrick, and Costello."

The fact that Fitzpatrick was living with Scott at Goldyke, and the fact that a number of mining claims were located in the names of Costello, Scott, and Fitzpatrick, of which he had knowledge, would not of themselves be sufficient to establish notice to him of the existence of partnership relations. It is a common occurrence for prospectors in locating claims to include the names of other parties, with whom they may have no contractual relations. The mere fact that Fitzpatrick was living with Scott certainly would not afford him any notice of his relations with Costello. There is no intimation in the evidence that Fitzpatrick ever saw any of the correspondence between plaintiffs and Scott, or that he was informed of their contents or effect prior to the Wonder

deal. Scott, in one of his early letters to Costello, requested the latter to say nothing about their agreement. It could hardly be presumed, in the absence of evidence, that Scott told Fitzpatrick of their relations simply because they were living together.

But the court says: "It appears from his (Fitzpatrick's) evidence that he learned of the relations existing between Scott and Costello at the time he first went to Goldyke." The record shows that Fitzpatrick was asked the question: "When did you first learn that Costello was interested with Scott?" The answer was, "When I first went to Goldyke." This question and answer appear to be all there is in the record upon which the court attributed to Fitzpatrick knowledge of the relations existing between plaintiffs and Scott; at least it is all that counsel has directed our attention to in their brief. The witness may have had one idea in mind and counsel another when the question was asked. Costello was "interested" with Scott in the locations at Goldyke. This Fitzpatrick knew, and this he may have had in mind when he answered the question, as the question and answer are entirely consistent with this view. Fitzpatrick may have known that Costello was "interested" with Scott in the locations, but may never have suspected the existence of partnership relations.

No attempt was made by further questions to ascertain to what extent the witness had knowledge of the relations existing between plaintiffs and Scott. He denied in his answer the existence of such partnership. The burden of proof was on plaintiffs to establish notice, or such a state of facts as would put a person upon inquiry. Both Scott and Fitzpatrick testified that the consideration for the transfer of the town-site interests was partially money owed by Scott to Fitzpatrick, supplies, etc., furnished, and partially an agreement upon the part of Fitzpatrick to do the location work for Scott on the Wonder claims. The court reviews the evidence upon the question of the alleged indebtedness existing between Scott and Fitzpatrick, and the matter of supplies alleged to have been furnished, and concludes that no such indebtedness existed, nor were any such supplies furnished. There is evidence to support this finding, and it is conclusive upon this court. Both Scott and Fitzpatrick testified that

part of the consideration was that Fitzpatrick was to do the location work upon the claims. Scott says further that he (Fitzpatrick) was to promote the town site, and that he considered such promotion would enhance the value of the mining properties.

The testimony shows that after Scott transferred his interest in the town site to Fitzpatrick, that Mays, Savage, and Fitzpatrick entered into an agreement with Kleeman & Co. for the latter to promote the town site upon a percentage, the latter company, in further consideration therefor, to do all the location work, to hold the claims, survey and plat the same. This the company did. Counsel for respondents contend that this shows that Fitzpatrick did none of this work. But if he agreed to do the work as part consideration for the transfer, and subsequently he made such arrangements that the work was done by some one else, neither Scott nor plaintiffs would be in position to complain, if the transaction was otherwise regular. Scott and the plaintiffs were relieved of paying their proportion of the expense of this work, which was estimated to be over $700. The agreement between Scott and Fitzpatrick was made in the latter part of May, and the contract with Kleeman & Co. entered into on June 1st following. At this time the value of the town site was more or less problematical.

We are unable to see wherein the evidence in the case discloses any bad motive upon the part of either Scott or Fitzpatrick in the transfer of the former's interest in the surface rights of the claims in question for town-site purposes. If Scott was defrauding plaintiffs, he was working the same injury upon himself. There is nothing in the evidence indicating that Scott was to derive any advantage from the town site, secret or otherwise, other than being relieved from the expense of doing his part of the location work upon the claims, surveying, etc. It may be that Scott at the time did not appreciate the value of the town site, and transferred it for less than it subsequently proved to be worth. However, it is not reasonable that he would seek to injure plaintiffs, when to do so he would inflict equal injury upon himself. If there was anything to indicate he retained any secret interest in the town site, and only plain-

tiffs were the sufferers, the situation would be quite different; but there is no such showing. As a member of the partnership of Costello, Newhall & Scott, he could make arrangements to do the location work upon the claims he had located, and if he acted in good faith, his copartners could not be heard to complain.

Scott had but little means at this time, and he knew money was hard for plaintiffs to get hold of, and if he arranged to secure work to be done, necessary to acquire title to the mining claims, upon a basis that was as fair to plaintiffs as it was to himself, plaintiffs are hardly in position to complain, unless it violated the conditions of the partnership. In the agreement between Scott and Fitzpatrick nothing but the interest in the surface was transferred; all mining rights were reserved. The partnership for general mining purposes entered into between plaintiffs and defendant Scott did not contemplate the promotion and sale of town sites, and this may be taken as some evidence that Scott did not contemplate defrauding his partners when he made the transfer. While the transfer by Scott to Fitzpatrick of his interest in the surface rights of the Wonder claims for town-site purposes is not clear in all particulars, yet, taking into consideration all of the facts and circumstances as disclosed by the record, we think the showing is insufficient to establish actual fraud in the transaction. The fact that the transfer was verbal does not, of itself, give plaintiffs a right to have it set aside; it being in reference to a matter concerning which Scott had power to bind the partnership.

7. It appears from the evidence that on August 2, 1906, the receiver came into possession of the sum of $1,816, moneys in bank belonging to the partnership of Costello, Newhall & Scott, and involved in the suit. The final decree of the court, among other things, adjudges and decrees to plaintiffs judgment against Scott for the sum of $2,180.60, which latter sum is in fact inclusive of the said sum of $1,816 in bank. The effect of this was to give plaintiffs a double judgment for one-half of $1,816. It is manifest that this double judgment was an oversight upon the part of the trial judge. Upon the hearing of the motion for a new trial

plaintiffs' counsel admitted the error in the judgment, and offered to remit the same. The court denied the motion for a new trial on condition that counsel for plaintiffs file a remission of this excess judgment, and they accordingly filed the same. Appellant contends that the court had no power to make such order; that its only course in the premises was to grant a new trial. We think the trial court adopted the appropriate procedure in the premises. It is not reasonable that parties should be put to the delay and expense of a new trial in order to correct an error in the amount of the judgment which both parties to the controversy admit is an error. Even if the trial court had denied the motion for a new trial without exacting this condition, this court would, upon its attention being called to the error, modify the judgment accordingly, and affirm the order denying the motion for a new trial. (Comp. Laws, 3434.)

8. The record shows that just prior to the beginning of the trial of this cause the Hidden Treasure Mining Company, a corporation, petitioned to intervene, setting up in its petition that it was the owner of certain mining claims in the Wonder Mining District, named the "Hidden Treasure," "Hidden Treasure No. 1," "Hidden Treasure No. 2," and "Skiddo Fraction"; said claims having been located by defendants Scott, Mays, and Savage on or about May 26, 1906; that on or about the ....... day of July, 1906, said defendants by deed conveyed said claims to said corporation, which ever since had been the owner thereof; that the plaintiffs claimed an interest in said claims by reason of the alleged partnership with defendant Scott. Because of the lateness of the application, the necessity of a continuance, and the fact that the decree in this case could not be binding on the corporation unless it was a party, the permission to intervene was denied. Although there has been some argument in the briefs thereon, the order of the court denying the prayer for intervention is not before us. Upon the trial the court, over defendant's objection, admitted in evidence the deed in question to the Hidden Treasure Mining Corporation. This deed is dated the 28th day of July, 1906, acknowledged on the 5th day of October, and recorded on the 22d day of October following,

and covers the mining claims mentioned in the petition. The decree gave to plaintiffs an undivided one-half of an undivided one-third of the claims in question.

The decree also contains the following general provision: "It is further ordered and said plaintiffs are hereby adjudged and decreed to be entitled to take and receive and have delivered to them an undivided one-half part, share and interest of, in, and to any and all other or further moneys or other consideration received or to be received by said defendant Scott, or contracted to be paid to him, or accruing to or in any wise arising out of any interest, property, right, title, estate, claim, or demand of said defendant Scott in any and all mining claims, premises, and property acquired by him between December 30, 1905, and August 2, 1906, and plaintiffs are entitled to and are hereby given judgment against the said defendant Scott for the same."

It is claimed that this, in effect, is a double judgment in favor of plaintiffs, as it decrees to them not only one-half of Scott's third interest in the claims deeded to the Hidden Treasure Mining Corporation, but also gives them one-half of all the stock issued by said corporation to Scott in consideration of the transfer of the claims. Plaintiffs, of course, are not entitled to an interest both in the stock and in the claims, and we think the trial court never intended to award them both such interests. No specific reference is made in the decree to stock in this corporation or any other. We do not understand from the decree that the court attempted to adjudicate the rights of the Hidden Treasure Mining Corporation, as contended by counsel for appellant, and it is manifest it could not do so. Besides, the court in its decision upon the motion to intervene distinctly stated that if the corporation was not allowed to intervene, no decree it would make would be binding upon the petitioner. Respondents in this case, with full knowledge of the transfer to the Hidden Treasure Corporation, have proceeded upon the theory that that transfer is void in so far as it affects their right to a half of the interest which Scott had to the locations. They have, in effect, elected to claim an interest in the ground itself, and not in the proceeds which Scott obtained therefor, and we think the decree should be so con-

strued. The decree being so construed, it cannot operate to give respondents a double judgment. Whether or not the deed by Scott of his interests in the claims transferred to the Hidden Treasure Corporation conveyed the title, so as to cut out the equities of plaintiffs, is not involved in, was not attempted to be determined in, and could not be determined in, this action in the absence of the corporation as a party. In this view of the case, the admission of the deed in evidence, even if erroneous, could not be prejudicial to defendants.

The record contains numerous other assignments of error, but the view we have taken upon the main questions makes it unnecessary, we think, to determine them.

As against all the appellants, excepting N. R. Fitzpatrick, the decree and judgment is affirmed, subject to the modification in accordance with the remission filed by respondents in the lower court, and also subject to the construction of the decree placed thereon by this court, and as to them the order denying the motion for a new trial is affirmed.

In so far as the judgment and decree is against the appellant N. R. Fitzpatrick, it is reversed, and a new trial is granted upon the issues between respondents and said appellant Fitzpatrick, excepting as to the issue involving partnership relations between respondent and defendant Scott.

It is further ordered that the cause be remanded for further proceedings, in accordance with the judgment and decree of the trial court and of this court. Appellant N. R. Fitzpatrick is entitled to his costs upon appeal.

### ·ON PETITION FOR REHEARING.

By the Court, NORCROSS, J.:

Counsel for appellants have filed a petition for rehearing in this cause upon several grounds. The opinion heretofore rendered covers satisfactorily, we think, all points raised in the petition, with one exception. Counsel in his petition says: "The judgment in the case at bar is not a final settlement of the partnership affairs. Paragraph 16 gives plaintiffs judgment against defendant Scott for $2,182.60, upon which execution may issue. This is also a separate judgment for costs of $936. Also a separate judgment for one-half of the

mining property. There is no balance struck. The judg-ment is for separate items of the partnership account. In paragraph 18 the plaintiffs are given judgment for one-half of all the moneys in the custody of the receiver, gross, and plaintiffs are entitled to have the same delivered to them *eo instante*. No account has been rendered by the receiver, who has possession of all the property. We submit that this judg-ment is indefinite and uncertain; so much so that this court cannot permit its execution or attempted execution by the lower court. It is to be executed piecemeal. In part by the delivery of specific real property; in part by execution upon separate items for money judgments; in part by the delivery of a divided one-half of money in the receiver's hands as against the claims of the receiver himself and the creditors of the estate, and those having prior charges against the property itself, to be paid out of those funds, where there is no balance struck as between the contending litigants. Con-fusion must arise upon attempting to satisfy, by execution, the separate items, when the officer may levy upon the very property directed by the other part of the judgment to be delivered to plaintiffs. The record does not show that the receiver possesses sufficient to pay his own claims and expenses, and, if his account were first settled, the court might direct to be paid to him, out of the funds of the estate, such an amount that there could be no independent judg-ment for separate money items. The court might find it necessary to sell all the real property to pay creditors, or other claimants, and the sale of all the real property, and division of the proceeds is the usual and ordinary method of settlement in partnership affairs."

Even if there was room for argument as to whether the judgment rendered in this cause was a final judgment, appel-lants by treating it as such, and appealing therefrom, are estopped to deny the finality of the decree. (*State* v. *Com-missioners*, 22 Nev. 78, *Clark* v. *Dunnam*, 46 Cal. 204; Bige-low on Estoppel, p. 601.)

The judgment in this case determined all the material issues raised by the pleadings. It determined the existence of the partnership, and ordered dissolution thereof. It gave to plaintiffs an undivided half interest in certain described

mining claims determined to have belonged to the partner-
ship. It gave judgment against defendant Scott for one-
half of $4,500, less certain specified deductions, the said sum
of $4,500 having been received by Scott upon account of
the partnership affairs prior to the institution of the suit
and the appointment of the receiver. It further allowed
plaintiffs their costs, taxed at $936.15.

The decree also contains the following provisions: "It is
further ordered, and said plaintiffs are hereby adjudged and
decreed to be entitled to take, receive, and have delivered
to them an undivided one-half of any and all moneys or
other consideration now in the keeping, custody, or control
of R. L. Douglass, receiver herein, and which moneys or
consideration has accrued or is accruing to the interest here-
tofore held, owned, or claimed by the defendant Scott in the
mining claims and premises herein mentioned, and plaintiffs
are hereby adjudged to be entitled to a delivery of the same,
and are hereby given judgment therefor. It is further
ordered, adjudged, and decreed that the said R. L. Douglass,
receiver herein, be, and he is hereby, directed to forthwith
make a full account of all his acts and proceedings herein,
and render the same to the court, and to forthwith transfer,
pay, and deliver to the plaintiffs herein, or their attorneys
of record, an undivided one-half of any and all moneys or
other consideration, received and now held by him as such
receiver, and accruing to the interest heretofore standing in
the name of and claimed by the said codefendant Fitzpatrick
in said town-site premises, and also to forthwith transfer,
pay, and deliver to plaintiffs, or their attorneys of record,
an undivided one-half of any and all moneys or other con-
sideration received and now held by him as such receiver,
and accruing to the interest, part, and share in said con-
tracts for the sale of certain of the aforesaid mining claims
and heretofore standing in the name of and claimed by the
said defendant Scott."

The decree concludes as follows: "The court hereby
reserves the right to make a supplemental decree herein
on proper showing made for that purpose, as to any other or
further property, if any, belonging to said copartnership, and
not adjudicated upon or included herein." The objections

made to that portion of the decree giving the respondents judgment for one-half of all moneys in the hands of the trustee go largely to the question of the finality of the decree. These objections would not be well taken, even if they could now be raised.

In Bates on Partnership, 970, the author says: "A decree finding the existence of a partnership and ordering a dissolution, or finding the fact and time of dissolution, and settling the proportions of interest of partners, and referring the cause to ascertain the specific amounts and to take the account, is a final decree for the purposes of appeal." ( *Clark* v. *Dunnam,* 46 Cal. 205; *Sharon* v. *Sharon,* 79 Cal. 703; *Arnold* v. *Sinclair,* 11 Mont. 556, 29 Pac. 340, 28 Am. St. Rep. 489; ·Black on Judgments, 41. See, also, note to *Williams* v. *Field,* 60 Am. Dec. 429.)

The record in this case contains a report of the receiver filed January 28, 1907, in pursuance of the decree, which decree was filed January 4, 1907. This report shows that the receiver had in his hands upon the date he filed his report moneys belonging to the partnership in the sum of $27,316.59. The receiver asked to be allowed a commission in the sum of $1,200, and for a reasonable allowance for his attorney's fees in the sum of $250. The report of the receiver does not show that there are any claims of third parties against the partnership; nor is it claimed that the record so shows. Counsel in his petition for rehearing asserts that, since the appeal, certain claims have been made by third parties of indebtedness due them from the partnership. Even if we could consider such claims as having been adjudicated, nevertheless it appears that the receiver has ample funds in his hands to pay them all, and have a large balance besides.

While the matter is not strictly before us, we deem it appropriate to say that claims of third parties, if any, should be adjudicated and settled before the final discharge of the receiver. Plaintiffs, of course, are liable for the partnership debts equally with the defendant Scott. Counsel for petitioner says that counsel for plaintiffs claim that under the decree awarding plaintiffs one-half of all moneys in the hands of the receiver they are entitled to such half immedi-

ately, irrespective of any indebtedness of the partnership. At the time the decree was entered there was no showing of any partnership indebtedness, and the court doubtless proceeded upon the theory that there was none. Objection to the decree is made because it has the effect of imposing the receiver's fees upon the defendant Scott. There is no specific reference in the decree covering the fees and expenses of the receiver, nor is there in the decision of the court. The decision of the court was that "plaintiffs are entitled to their costs herein expended." No other reference is made to costs or expenses of the proceeding. Findings and decree were ordered to be entered in accordance with the opinion. If it was the intention of the court to impose all the receiver's costs upon the defendant Scott, we think it should have been so definitely expressed, and not left to inference from the decree which in this case, as is usual, was prepared by counsel for the prevailing party. The allowance of the fees of the receiver as costs in the proceeding is a matter in the legal discretion of the trial court. In this case it is not clear what disposition the court intended to make of these fees and expenses. It is quite possible in a case of such magnitude the question of taxing the receiver's fees and expenses was either overlooked entirely, or that it was the intention of the court that that matter be disposed of upon the settlement of the receiver's final account.

A literal construction of the decree would undoubtedly impose all the fees and expenses of the receiver upon the defendant Scott. Where such is not manifestly the intention of the trial court, we are not disposed so to regard it. The order appointing the receiver recites the reasons therefor as follows: "Upon reading the said verified complaint, and it appearing to the court therefrom that it is a proper case for the appointment of a receiver, and it further appearing to the court that it is for the best interest of the said copartnership that a receiver, with all the usual powers, be appointed to take charge of all and singular the said copartnership business, properties, and effects, as set forth and described in the said complaint, and hold and preserve the same pending the further order of the court." It appears from this order that the court deemed the appointment of the receiver for the

"best interest of the said copartnership." Plaintiffs and defendant Scott were equally interested in the partnership affairs, and if the receiver was deemed to be for the best interest of the partnership, then both parties were equally benefited by the receivership. "If the appointment of the receiver is for the equal benefit of both parties to the action, as in a suit for the settlement of partnership affairs, the receiver's compensation should be borne by both parties equally." (High on Receivers, 796.)

In *Johnson* v. *Garrett*, 23 Minn. 565, the court said: "The court charged in the account against plaintiff the whole compensation allowed to the receiver. There are no facts stated in the finding to sustain this. The receiver was appointed for the benefit of both parties, and, we must presume, upon a showing that justified it; and the court, we must presume, allowed him only what his services were worth. These services were of equal benefit to both parties. His appointment relieved each of them from transacting the business he was paid to do. Where the appointment of a receiver benefits equally all the parties, they should, as a general rule, share the expense equally. One-half of the sum so charged to plaintiff, to wit, $250, must be deducted from the judgment."

As the record appears in this court, there is ample money in the hands of the receiver to pay such fees and expenses as the court may award the receiver, to pay all just claims, if any, against the partnership, and out of the half remaining and belonging to defendant Scott, to pay plaintiffs their judgment for costs taxed at $936.15 and the amount of $1,272.60, determined to be due plaintiffs from defendant Scott on account of their one-half interest in the money received by Scott on account of the partnership prior to the institution of suit. If there is money in the hands of the receiver after paying the fees and expenses of the receiver and the debts of the partnership to make these payments to plaintiffs, they should be so made, instead of being enforced by execution prior to the settlement of the receiver's accounts.

It is ordered that the decree in this cause be further modified by providing that the fees and expenses of the receiver be paid one-half by the plaintiffs, and one-half by the defend-

ant Scott, and that after all the expenses of the receivership, and all partnership indebtedness, if any, has been paid and discharged, the funds remaining in the hands of the receiver shall be paid one-half to the plaintiffs, and one-half to the defendant Scott, subject, however, to the right of plaintiffs to receive from defendant Scott's portion, if the same is sufficient, the amount of plaintiffs' judgment against defendant Scott for the sums of $1,272.60 and $936.15 costs.

With these additional modifications, the judgment and order of this court as heretofore made on the 2d day of January, 1908, will stand as the judgment and order of this court.

A rehearing is denied.